## In re BEST LOCK CORPORATION SHAREHOLDER LITIGATION

### C.A. No. 16281.

Court of Chancery of Delaware.
New Castle County.

Submitted: July 11, 2001.
Decided: Oct. 29, 2001.

Bruce L. Silverstein, Christian Douglas Wright, Danielle Gibbs, Esquires, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; and R. Bruce McNew, Esquire, of Taylor & McNew, Wilmington, Delaware, Co–Lead Counsel for Plaintiffs.

A. Gilchrist Sparks, III, Alan J. Stone, David J. Teklits, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Robert T. Markowski and David M. Kroeger, Esquires, of Jenner & Block, LLC, Chicago, Illinois, Counsel for Defendants.

## OPINION

CHANDLER, Chancellor.

Plaintiffs Dennis Wood, Castillian Ventures, Inc., Cardinal Capital Management, James E. Mitchell, Mitchell Partners, L.P., Daniel F. Raider, and Edward McLaughlin assert both fiduciary duty and disclosure claims against defendants Best Lock Corporation ("BLC"), Best Universal Lock Company ("BUL"), and Frank E. Best, Inc. ("FEB") (each individually a "Best Company" and collectively the "Best Companies"), as well as Walter E. Best Company Inc. ("WEBCO") and individual defendants Russell C. Best and Mariea L. Best (the "individual defendants" or the "Bests"). Pending before the Court are defendants' partial motion to dismiss the

consolidated complaint[1] and plaintiffs' motion for class certification.

The plaintiffs were minority shareholders of one or more of the Best Companies, all three of which were publicly traded companies incorporated in Delaware.[2] FEB was a holding company with no business operations of its own. FEB's only substantial asset was a majority interest in BUL. BUL, in turn, was also a holding company with no business operations of its own. BUL's only substantial asset was a majority interest in BLC. BLC engaged in the business of making door locks, although it also owned, at times, a substantial percentage of FEB. WEBCO was an Indiana corporation that was wholly owned by members of the Best family at all times and that ultimately became wholly owned by Russell and Mariea Best. At the time of the mergers challenged in this action, Russell Best owned all of the outstanding voting shares and Russell and Mariea Best beneficially owned all of the outstanding non-voting shares of WEBCO. Russell Best also personally exercised voting control over FEB and was the President, Chairman of the Board, and CEO of each of the Best Companies. The individual defendants, Russell and Mariea Best, were the only directors of each of the Best Companies at all times relevant to this litigation.

Plaintiffs' claims arise out of a sale of FEB stock by BLC (the "Challenged Sale") and out of three interrelated freeze-out mergers of the Best Companies consummated on March 23, 1998 (the "Freeze-Out Mergers"). In the Challenged Sale, BLC, which at the time allegedly owned a majority of FEB voting stock, sold 23,000 shares of FEB to WEBCO, which was wholly owned by Russell and Mariea Best. This sale reduced BLC's ownership of FEB to approximately 49.5%. In the Freeze-Out Mergers, three wholly owned subsidiaries of WEBCO merged with and into the three Best Companies.[3] All of the plaintiffs were cashed out in the Freeze-Out Mergers. The surviving entities were subsequently merged with and into WEBCO, which was then renamed Best Lock Corporation.

## I. THE CLAIMS

The plaintiffs make many allegations in the 67-page complaint, but ultimately they assert only three claims.[4] In Count I, they allege that Russell and Mariea Best, as well as FEB and BUL, breached their fiduciary duty of loyalty and good faith as

1. The actions consolidated are *Wood v. Frank E. Best, Inc.*, Del.Ch., C.A. No. 16281, and *Mitchell v. Best*, Del.Ch., C.A. No. 18203.

2. FEB and BUL were originally incorporated in Washington, but they redomesticated in Delaware in 1995. Compl. ¶ 52. BLC, so far as the record shows, was always incorporated in Delaware.

3. It is unclear from the consolidated complaint whether the WEBCO subsidiaries were merged into the Best Companies or vice versa. *Compare id.* ¶ 144 ("Webco One was merged with and into FEB, Webco Two was merged with and into BUL, and Webco Three was merged with and into BLC.") *with id.* ¶¶ 9–11 (noting that each of the Best Companies was "eliminated in a cash-out merger").

The Information Statement distributed in connection with the Freeze-Out Mergers states that the WEBCO subsidiaries were merged into the Best Companies. Ultimately, the direction of the mergers is not important to this litigation. What is important is that the Freeze-Out Mergers were accompanied by reverse stock splits that resulted in the cashing out of all shareholders other than Russell and Mariea Best.

4. The plaintiffs note that there are "practical limitations upon their ability to pursue" other claims, including this Court's previous decision in *Wood v. Frank E. Best, Inc.*, Del.Ch., C.A. No. 16281, Chandler, C., 1999 WL 504779 (July 9, 1999), that claims arising from transactions occurring in 1994 and 1995 are time-barred. Compl. ¶ 153.

directors and majority shareholders of the Best Companies by engaging in unfair dealing (including providing inadequate disclosure) and paying an unfair price in the Freeze–Out Mergers. The plaintiffs also contend in Count I that the Information Statement was materially false and misleading and that the Bests favored their own personal financial interests while failing to rely on any protective mechanisms that would have simulated arm's length bargaining. As a result, the plaintiffs argue, the Freeze–Out Mergers are subject to heightened scrutiny and the plaintiffs are entitled to compensatory and rescissory damages.

In Count II, plaintiffs allege that the Challenged Sale divested the public shareholders of control of BUL and BLC and delivered control to Russell and Mariea Best. This claim is based on the theory that whenever there is a circle of majority ownership among corporations (*i.e.,* Corporation A owns a majority of Corporation B, which owns a majority of Corporation C, which, in turn, owns a majority of Corporation A), Section 160(c) of the Delaware General Corporation Law operates to "sterilize" the voting power of all shares in any of the majority-owned corporations owned by any of the other majority-owned corporations.[5] Plaintiffs contend that the Best Companies were so situated during the existence of the Best Lock Partnership ("BLP")[6] and/or between the dissolution of BLP and the Challenged Sale, as explained more fully below. Consequently, plaintiffs insist, all shares owned by the Best Companies were sterilized under Section 160(c) and the public shareholders, who owned approximately 14% of BUL and approximately 20% of BLC, or a ma-

jority of the shares not owned by the Best Companies (*i.e.,* a majority of the shares still entitled to vote), had control of those two corporations. Because the Challenged Sale broke this interlocked chain of majority ownership by bringing BLC's ownership interest in FEB down to 49.5%, FEB's shares of BUL and BUL's shares of BLC were once again entitled to vote, and Russell and Mariea Best, as controlling shareholders of FEB, regained indirect control of BUL and BLC. Accordingly, plaintiffs assert that Russell and Mariea Best breached their fiduciary duty of loyalty and good faith as directors of BLC in connection with the Challenged Sale by divesting the public shareholders of voting control of BUL and BLC and delivering that control to themselves. Plaintiffs seek compensatory and rescissory damages, a constructive trust over the 23,000 shares of FEB sold in the Challenged Sale, and disgorgement of any profits realized as a result of the Challenged Sale.

Finally, in Count III the plaintiffs allege that Russell and Mariea Best, as directors of the Best Companies, were obliged to seek the "maximum value reasonably attainable" in connection with the Challenged Sale as a result of the Delaware Supreme Court's holding in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[7] This duty arose, plaintiffs contend, because prior to the Challenged Sale Russell and Mariea Best lacked the voting power to prevent the sale of BLC to a third party.[8] This claim, like Count II of the plaintiff's consolidated complaint, rests on the assumption that Section 160(c) sterilized FEB's majority interest in BUL and BUL's majority interest in BLC, resulting in the public shareholders of BUL and

---

**5.** 8 *Del. C.* § 160(c) (2001).

**6.** As explained below, BLP was a partnership formed to facilitate the buyout of the interests in any of the Best Companies owned by mem-

bers of the Best family other than Russell and Mariea Best.

**7.** Del.Supr., 506 A.2d 173 (1985).

**8.** Compl. ¶ 169.

BLC obtaining voting control over those two companies. Because Russell and Mariea Best failed to obtain the maximum value reasonably attainable in this "buyout transaction," plaintiffs seek compensatory and rescissory damages.[9]

For the reasons explained more fully below, I deny defendants' motion to dismiss with regard to the fiduciary duty claims in connection with the Freeze–Out Mergers and the Challenged Sale and grant defendants' motion with regard to the independent disclosure claims as well as the so-called *Revlon* claim. I also grant plaintiffs' application for class certification, albeit provisionally.

## II. FACTUAL AND PROCEDURAL HISTORY [10]

The Best Companies trace their roots to an invention of Frank E. Best, a high school janitor from Seattle, Washington. Frank Best invented a security system known as the "interchangeable core and masterkey system" in order to avoid having to carry a cumbersome collection of iron keys around his school. In 1920, he incorporated FEB to manufacture and sell locks using his security system. He formed BUL as a subsidiary of FEB in 1924, selling a minority interest in BUL to the public in order to raise additional capital for his new company while maintaining majority-voting control over the enterprise. He repeated this process in 1928, creating BLC as a subsidiary of BUL and, again, selling a minority interest to the public. Frank Best created this corporate structure in order to raise capital for the Best Companies while still retaining voting control over them.[11]

By the early 1990s, the Best Companies had grown substantially and undergone various changes. The basic corporate forms and ownership structure, however, remained intact. FEB still owned a majority interest in BUL and BUL still owned a majority interest in BLC. FEB was no longer controlled by Frank Best, but by his son, Walter Best, and other members of the Best family, both directly and through WEBCO. At that time, Walter Best owned all of the voting shares of WEBCO and other Best family members owned non-voting shares. WEBCO functioned essentially as a holding company for shares of the Best Companies, particularly FEB, beneficially owned by Best family members.[12]

The ownership structure of the Best Companies changed dramatically between 1994, when Walter Best's youngest son Russell Best began his bid for control of the company, and 1998, when the Freeze–Out Mergers were consummated. By the end of this period, Russell Best had the voting power necessary to accomplish the Freeze–Out Mergers and to merge all three Best Companies into WEBCO, which by that point was wholly owned by Russell and Mariea Best. The events that occurred during this period are the basis for the plaintiffs' allegations against the defendants.

In May of 1994, in an attempt to guard against outside interests one day gaining control of the family business, Walter Best allowed Russell Best to assume control of the Best Companies. Russell Best purchased 19.34% of the then-outstanding shares of FEB from the Walter E. Best Irrevocable Trust. He also purchased 1,000 voting shares of WEBCO from Walter Best directly. This purchase provided Russell Best with voting control of the

9. *Id.*

10. All facts are taken from the well-pled allegations of the complaint.

11. Compl. ¶¶ 20–22.

12. *Id.* ¶¶ 23–26, 32.

30.93% of the then-outstanding shares of FEB held by WEBCO. These transactions, through which Russell Best acquired voting control of a majority (50.27%) of the shares of FEB, were financed by a loan from BLC. Through his control of FEB, Russell Best also gained indirect control of both BUL and BLC, because FEB owned a majority of the shares of BUL and BUL owned a majority of the shares of BLC.[13]

Once he had voting control of the Best Companies, Russell Best began working toward his ultimate goal of privatizing the Best Companies and merging them into one entity under his sole control. During his first year as the sole controlling stockholder of the Best Companies, Russell Best made himself and his wife, Mariea, the sole directors of BLC.[14] The next year, Russell Best fired his father and his brothers from the business. Walter Best threatened to sue, leading to a settlement agreement among the family members pursuant to which the interests in any of the Best Companies held by any Best family members, other than Russell and Mariea Best, were bought out by BLC or BLP, a new partnership formed to facilitate this buyout. In addition, all Best family members other than Russell and Mariea Best resigned from their various positions with the Best Companies. This arrangement, like Russell Best's earlier acquisition, was also financed by BLC.[15]

BLP was structured to give Russell Best absolute voting control over any shares of stock held by the partnership. BLP had three partners: Russell Best, WEBCO, and BLC. BLC paid cash for an 87% interest in the partnership, while Russell Best financed his share of the partnership by causing BLC to release the collateral he had given BLC in connection with the loan he used to finance his earlier acquisition of FEB and WEBCO shares. Notwithstanding the source of the funds or the disparity in equity ownership, Russell Best and WEBCO were the voting partners of BLP, and BLC maintained a non-voting interest. Thus, although BLC owned 87% of the equity of BLP, Russell Best, not BLC, had voting control over the shares held by the partnership. Plaintiffs allege that BLP was formed and organized for the sole purpose of allowing Russell Best to control shares of the Best Companies that he could not afford to buy outright.[16]

As a result of the buyout of the other Best family members, Russell Best's direct and indirect control over the Best Companies was strengthened. In addition to the approximately 25% of FEB shares Russell Best owned directly, he indirectly controlled the voting of the approximately 29% of FEB shares owned by BLP since he had absolute voting control over that partnership. Before, Russell Best had controlled FEB in part because of his power to vote any shares of FEB held by WEBCO. Now, he controlled approximately 54% of FEB's shares through his direct ownership of FEB shares and indirect control of the FEB shares owned by BLP.[17]

In late 1995, Russell Best caused FEB and BUL to change their states of incorporation from Washington to Delaware. Plaintiffs allege that this redomestication facilitated the privatization of the Best Companies because, in contrast to Wash-

---

13. *Id.* ¶¶ 31–33.

14. *Id.* ¶ 33.

15. *Id.* ¶¶ 39–44.

16. *Id.* ¶¶ 44–46. It is unclear from the consolidated complaint what consideration was

received from WEBCO for its partnership interest in BLP.

17. The parties disagree on whether BLP (or, indirectly, Russell Best), which actually held the FEB shares, or BLC, which owned approximately 87% of the equity of BLP, directly controlled these FEB shares.

ington, Delaware requires only a majority vote for a merger rather than a two-thirds vote, Delaware allows shareholder action by written consent, and Delaware does not provide for cumulative voting as a default rule. At the same time, Russell Best caused BLC to insert an exculpatory provision, pursuant to Section 102(b)(7) of the DGCL, into its certificate of incorporation.[18]

In 1995 and 1996, Russell Best caused BLC to begin buying out public shareholders of the Best Companies, presumably to facilitate the eventual going-private transaction by eliminating some public shareholders while simultaneously increasing his pro-rata ownership of the Best Companies. In a series of transactions, he caused BLC to purchase at least 146,049 shares of FEB, 18,861 shares of BUL, and 1,000 shares of BLC.[19] By 1996, Russell Best began in earnest the process of planning a going-private transaction. In May of 1997, he hired Piper Jaffray, Inc. ("Piper") to deliver a fairness opinion with respect to the price he was willing to pay to acquire all of the outstanding equity of the Best Companies. On August 12, 1997, representatives of Arthur Andersen LLP and Jenner & Block, the Best Companies' tax and legal advisors, respectively, presented an overview of a going-private transaction to the Boards of Directors of the three Best Companies (i.e., Russell and Mariea Best). At the meeting, the transaction was presented as a series of reverse stock splits that would culminate with the ultimate merger of each company into WEBCO.[20]

On August 25, 1997, BLP was dissolved. The 204,053 shares of FEB held by BLP were distributed to the general partners of BLP—Russell Best, WEBCO, and BLC. As a result of this distribution, BLC's direct ownership of FEB increased to approximately 54%. Following the dissolution of BLP, BLC executed the Challenged Sale, selling 23,000 shares of FEB stock to WEBCO. This sale was enough to drop BLC's ownership of FEB to 49.5%, or just below 50%. The plaintiffs allege that this sale was executed in order to avoid circular majority ownership among the Best Companies and thereby to reverse the sterilization of all shares of any of the Best Companies owned by any other Best Company under Section 160(c) of the DGCL.[21]

In late October of 1997, the proposed form of the going-private transaction changed. Under the new plan, each of the three Best Companies would merge with a separate, newly formed subsidiary of WEBCO. FEB would merge with Webco One, BUL would merge with Webco Two, and BLC would merge with Webco Three. Following these separate mergers, the three merged entities would be collapsed into WEBCO, which was wholly owned by Russell and Mariea Best.[22]

Webco One, Webco Two, and Webco Three (the "Webco Subsidiaries") were formed in November of 1997 as wholly owned subsidiaries of WEBCO. Russell and Mariea Best were appointed as the sole directors of each of the Webco Subsidiaries and Russell Best was appointed as the sole officer of each company.[23] Russell

18. Id. ¶¶ 52–53.

19. Id. ¶¶ 54–55, 63.

20. Id. ¶¶ 69–73, 88–89.

21. Id. ¶¶ 92–95.

22. It is unclear whether WEBCO became wholly owned by the Bests after the buyout of

the family members, after the dissolution of BLP, or sometime in between.

23. Id. ¶ 91. It is unclear from the complaint whether or not Mariea Best was a director of the Webco Subsidiaries. Compare id. ¶ 91 ("Russell and Mariea Best were appointed to the [sic] be the sole directors [of the Webco Subsidiaries].") with id. ¶ 112 (describing

and Mariea Best, as the Boards of Directors of each of the Best Companies and the Webco Subsidiaries, approved the mergers between each of the Best Companies and the Webco Subsidiaries on or before December 1, 1997, the day the Bests formally authorized Piper to deliver its fairness opinion.[24] On February 27, 1998, Russell Best executed written consents to the mergers on behalf of the voting shareholders of each of the Best Companies.[25] No vote of the public shareholders was taken for any of the Best Companies, nor was a full shareholder meeting of any of the Best Companies held. An "Information Statement, Notice of Action Taken Without a Meeting and Notice of Appraisal Rights" ("Information Statement") regarding the pending Freeze–Out Mergers was mailed to all public shareholders of the Best Companies on or about March 2, 1998.[26] As discussed in greater detail below, the plaintiffs contend that the Information Statement was materially false and misleading.[27]

The Freeze–Out Mergers were consummated on March 23, 1998. Each share of BLC was converted to the right to receive either 1/15,926 of a new fully paid and nonassessable share in the surviving corporation or, for shareholders who did not hold enough shares to receive a whole share of the new BLC common stock, a cash payment of $525.43 per share of BLC stock. Similarly, each share of BUL was converted to the right to receive either 1/27,272 of a share of stock in the surviving entity or a cash payment of $120.69 per share of BUL stock. Finally, each share of FEB was converted to the right to receive either 1/115,809 of a share of stock in the surviving entity or a cash payment of $53.61 per share of FEB stock.[28]

No shareholder other than Russell and Mariea Best, WEBCO, or other Best Companies had enough shares to elect to receive shares in the surviving entities. Thus, every unaffiliated minority shareholder, *i.e.*, every shareholder except Russell and Mariea Best (or an entity under their control), was cashed out. The minority shareholders were presented with two options: they could accept the merger consideration or they could refuse the merger consideration and preserve their appraisal rights.

The corporations surviving the Freeze–Out Mergers were then merged into WEBCO and WEBCO was renamed Best Lock Corporation. Thus, in the end, Russell and Mariea Best became sole owners of the only surviving entity, Best Lock Corporation. Russell Best was named sole director and President of this entity.[29]

Russell Best as "the sole director of [the Webco Subsidiaries]"). Mariea Best's status with respect to the Webco Subsidiaries is not relevant to any of the claims raised in this litigation. Any fiduciary duties owed by the directors of the Webco Subsidiaries would run to their sole shareholder, WEBCO (which was wholly owned by Russell and Mariea Best), and there is no claim that these duties were violated. Moreover, any transaction involving the Webco Subsidiaries and any of the Best Companies would clearly be an interested transaction regardless of Mariea Best's status since Russell Best was a director and officer of all of the companies and Mariea Best, his wife, was at least a director of the Best Companies.

24. *Id.* ¶ 112.

25. *Id.* ¶ 114. Russell Best acted on behalf of BUL to approve the merger of BLC, on behalf of FEB to approve the merger of BUL, and on behalf of himself and WEBCO to approve the merger of FEB.

26. *Id.* ¶¶ 114–15.

27. *Id.* ¶¶ 116–43.

28. *Id.* ¶¶ 144–46.

29. *Id.* ¶¶ 148–49.

In addition to this action currently pending before the Court, there is an appraisal action asserted by former shareholders of the Best Companies. These actions are proceeding separately. Today, I consider only the motion to dismiss and the motion to certify a class in this fiduciary duty action.

## III. STANDARD OF REVIEW ON A MOTION TO DISMISS

■ The applicable standard on a motion to dismiss is clear. The Court must assume the truthfulness of all well-pled facts alleged in the complaint, view all inferences from those facts in the light most favorable to the plaintiffs, and determine with "reasonable certainty" that the plaintiffs would not be entitled to relief under any set of facts that could be proven.[30]

## IV. COUNT I: BREACH OF FIDU-CIARY DUTIES IN CONNECTION WITH THE FREEZE–OUT MERG-ERS

Plaintiffs allege that the defendants engaged in unfair dealing in connection with the Freeze–Out Mergers in six ways: (1) by favoring their own financial interests over those of the Best Companies and the public shareholders;[31] (2) by divesting the public shareholders of control of BUL and BLC through the Challenged Sale;[32] (3) by manipulating the financial data provided to Piper;[33] (4) by disseminating a false and misleading Information Statement;[34] (5) by timing and structuring the Freeze–

Out Mergers in a manner calculated to disadvantage the public shareholders and advantage the Bests;[35] and (6) by failing to rely upon any protective structural mechanisms such as a committee of independent directors, a ratifying vote of the public shareholders, or the use of an independent investment banker.[36] Moreover, plaintiffs contend that the defendants paid an unfair price in the Freeze–Out Mergers.[37] Finally, plaintiffs assert that because the defendants are self-dealing fiduciaries, the defendants bear the burden of showing that the Freeze–Out Mergers satisfy the entire fairness test.[38]

Because plaintiffs' second claim of unfair dealing is essentially the same as Count II of the consolidated complaint, which alleges that the defendants breached their fiduciary duties in connection with the Challenged Sale, I will defer consideration of that claim until I address the merits of the second cause of action later in this opinion. Plaintiffs' first, fifth, and sixth claims of unfair dealing, as well as their claims of unfair price and unfair process, present variations on a basic underlying claim of self-dealing. I will consider these claims first. Plaintiffs' third and fourth claims of unfair dealing both address the disclosures in connection with the Freeze–Out Mergers. These claims are related to one another and independent of the self-dealing claims. I will consider them second. Finally, defendants have raised a defense of acquiescence. I will consider this defense third.

---

30. *See Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 38 (1996).

31. Compl. ¶ 158.

32. *Id.* ¶ 159.

33. *Id.*

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.* ¶ 160.

38. *Id.* ¶ 161.

### A. Allegations Based on Self–Dealing

■ The complaint alleges self-dealing by the defendants in several forms, as set forth in more detail above and in this Court's earlier opinion in *Wood v. Frank E. Best, Inc.*[39] Assuming the truth of these allegations, as I must on a motion to dismiss, I conclude that the plaintiffs have stated a claim for breach of the duty of loyalty. Moreover, because the defendants did not employ any traditional structural protections in connection with the Freeze–Out Mergers, they bear the burden of showing that the Freeze–Out Mergers were entirely fair.[40] Defendants have not challenged this in their motion to dismiss. The only challenge they have raised with respect to these claims is acquiescence, which is discussed in detail below.

### B. Allegations Based on Inadequate Disclosure

■ The plaintiffs allege that defendants made several material misrepresentations in the Information Statement. In order for alleged misrepresentations to be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholders.[41] In this case, plaintiffs must show that the infor-mation missing from the Information Statement "would have assumed actual significance in the deliberations" of reasonable shareholders of the Best Companies in deciding whether to accept the merger consideration or to refuse the merger consideration and preserve their appraisal rights.[42]

■ In order to state a disclosure claim, the plaintiffs must " 'allege that facts are missing from the [Information Statement], identify those facts, state why they meet the materiality standard and how the omission caused injury.' "[43] To satisfy this burden, the plaintiffs contend that the Information Statement sent by the Best Companies to its shareholders in connection with the Freeze–Out Mergers was materially defective in six ways. First, plaintiffs assert that the Challenged Sale was not adequately disclosed.[44] Second, plaintiffs claim that the Information Statement contained material misrepresentations concerning the valuation methodology used by Piper.[45] Third, plaintiffs contend that the Information Statement contained material misrepresentations concerning the independence of Piper.[46] Fourth, plaintiffs allege that the Information Statement contained material misrepresentations concerning financial projections provided to Piper by the man-

---

39. Del.Ch., C.A. No. 16281, mem. op. at 7–9, Chandler, C., 1999 WL 504779 (July 9, 1999).

40. *See, e.g., id.* at 9 ("[L]ack of these safeguards means that there is nothing in the record at this stage of the proceedings to indicate that the merger was fair to the public shareholders."); *Nagy v. Bistricer*, Del. Ch., 770 A.2d 43, 51 (2000) ("In effecting the Merger, [the directors and controlling shareholders] did not deploy any of the mechanisms traditionally used to protect minority stockholders and thus they will bear the burden to show that the transaction was entirely fair.").

41. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

42. *Id.*

43. *Skeen v. JoAnn Stores, Inc.*, Del.Supr., 750 A.2d 1170, 1173 (2000) (quoting *Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 140 (1997)).

44. Compl. ¶¶ 93–98, 138.

45. *Id.* ¶¶ 116–22.

46. *Id.* ¶¶ 123–27.

agement of the Best Companies.[47] Fifth, plaintiffs assert that the financial projections provided to Piper were improperly omitted from the Information Statement.[48] Finally, plaintiffs claim that the Information Statement contained "other" miscellaneous material misrepresentations and omissions.[49] I will address each of these categories in turn.

■ I turn first to the disclosure claims in connection with the sale of FEB stock to WEBCO by BLC. The plaintiffs were never asked to make any decisions about the Challenged Sale. The only decision faced by the plaintiffs in this case was whether to tender their shares in the Freeze–Out Mergers or to keep their shares and perfect their appraisal rights. Further disclosure regarding the Challenged Sale would not have been helpful with respect to this decision because it would not have altered the total mix of information available to the plaintiffs. Moreover, the additional disclosure sought by the plaintiffs would have forced the Boards of Directors of the Best Companies to engage in "self-flagellation" and to draw adverse legal conclusions potentially implicating themselves in breaches of fiduciary duty. Such disclosure is not required under well-established principles of Delaware law.[50]

■ Second, plaintiffs challenge the disclosure concerning Piper's valuation methodology. Plaintiffs contend that the defendants made an "egregious misrepresentation" by stating that " '[Piper's] evaluation of the price ranges were established ... in terms of valuation methods employed in appraisal proceedings under Section 262 of the DGCL and applicable case law.' "[51] The next portions of the complaint detail why Piper's analysis did not conform with the valuation methods employed in a statutory appraisal proceeding. This is misleading, plaintiffs argue, because it may cause shareholders to think that "demanding an appraisal is not a worthwhile endeavor because a Delaware Court will employ the same sort of valuation analysis as was employed by Piper."[52]

Although Piper may have used methods to appraise the shares that would differ from methods used by this Court in a statutory appraisal proceeding, I do not believe that the alleged misrepresentations made about Piper's valuation methodologies are material. The language of the Information Statement cited by the plaintiffs could only mislead shareholders into thinking that they might not receive more money for their shares in a statutory appraisal, as plaintiffs contend, if these statements were isolated from the rest of the Information Statement. Read as a whole, the Information Statement directly contradicts such a conclusion. Specifically, the Information Statement states prominently and in capital letters, in a section entitled "Stockholders' Rights of Appraisal," that "STOCKHOLDERS CONSIDERING SEEKING APPRAISAL SHOULD BE AWARE THAT THE FAIR VALUE OF THEIR SHARES AS DETERMINED UNDER SECTION 262 COULD BE MORE THAN, THE SAME AS OR LESS THAN THE CONSIDERATION THEY WOULD RECEIVE PURSUANT TO THE MERGER AGREEMENT IF

47. *Id.* ¶¶ 128–33.

48. *Id.* ¶¶ 134–36.

49. *Id.* ¶¶ 137–42.

50. *See, e.g., Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 143 (1997)

("The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.").

51. Compl. ¶ 116 (quoting Information Statement, Ex. 2 of Defs.' Opening Br., at 20).

52. *Id.*

THEY DID NOT SEEK APPRAISAL OF THEIR SHARES." [53] Moreover, the Information Statement also states prominently, and again in capital letters, that Piper's opinion "DOES NOT CONSTITUTE A RECOMMENDATION TO ANY STOCKHOLDER AS TO WHETHER ANY STOCKHOLDER SHOULD EXERCISE APPRAISAL RIGHTS IN RESPECT OF THE MERGERS." [54] Thus, any misrepresentation regarding the valuation methodology employed by Piper is not material and the motion to dismiss with regard to these statements is granted.

 Next, plaintiffs allege that Piper was not independent, contrary to the defendants' representations in the Information Statement. This is important to the public shareholders of the Best Companies, plaintiffs contend, because they may rely on Piper's independence to "conclude that the merger consideration and the

methodology by which it was determined are fair to the public stockholders." [55] Although the Information Statement refers to Piper as an "independent financial advisor," the Information Statement does not attempt to hide any of the relationships between Piper and the Best Companies. In fact, the Information Statement clearly describes the extent of the relationship between Piper and the defendants, including fee arrangements, past relationships, and the like. [56] Therefore, I do not think that further disclosure regarding the purported independence of Piper (or lack thereof) would change the total mix of information available to the shareholders. Moreover, as noted above, the Information Statement makes clear that Piper's valuation may be higher or lower than what the shareholders could receive in a statutory appraisal proceeding. Finally, the Information Statement also encourages shareholders to read the Piper opinions themselves. [57] Thus, any

---

**53.** Information Statement at 29–30. Several similar statements appear in other portions of the Information Statement. *See, e.g., id.* at 9 ("There can be no assurance, however, that if a stockholder of a Company properly perfected his appraisal rights with respect to the Common Stock of such Company under the DGCL, the stockholder would not receive more than or less than the cash consideration applicable to such Company."); *id.* at 28 ("There can be no assurance, however, that if a stockholder properly perfected his appraisal rights under the DGCL, he would receive more or less than the applicable cash consideration to be paid in the applicable Merger."). The contents of the Information Statement can be considered on a motion to dismiss because the Information Statement was incorporated by reference into the complaint. *See* Compl. ¶¶ 115–43 (basing disclosure claims on the contents of the Information Statement); *see also In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69–70 (1995) (noting that it is "certainly proper" to consider the disclosure document on a motion to dismiss a disclosure claim "because the operative facts relating to such a claim

*perforce* depend upon the language" of the disclosure document).

**54.** Information Statement at 16.

**55.** Compl. ¶ 123.

**56.** Information Statement at 14 (explaining, in detail, the course of dealings between and among Piper, the Best Companies, and Russell Best's legal and tax advisors); *id.* at 16 (noting that the financial information reviewed by Piper relating to BLC was "furnished to Piper Jaffray by management of BLC"); *id.* at 20 (describing the compensation arrangement).

**57.** *See id.* at 8 ("STOCKHOLDERS ARE URGED TO READ THE OPINIONS OF PIPER JAFFRAY CAREFULLY IN THEIR ENTIRETY."); *id.* at 15–16 ("THE SUMMARY OF THE PIPER JAFFRAY OPINIONS SET FORTH IN THIS INFORMATION STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH OPINIONS AND STOCKHOLDERS ARE URGED TO READ THESE OPINIONS IN THEIR ENTIRETY."). The opinions, which are attached to the Information State-

potential misrepresentation regarding the independence of Piper, or lack thereof, is not material and the motion to dismiss with regard to these statements is granted.

■ Fourth and fifth, the plaintiffs contend that the Information Statement contains misrepresentations about the financial data supplied to Piper by the management of the Best Companies and also fails to disclose that data. It is uncontested that Piper used data prepared by management to create its own financial projections. This fact is clearly disclosed in the Information Statement.[58] Plaintiffs believe this disclosure was incomplete or inaccurate for several reasons, including that it was not disclosed that management created these projections specifically for the purposes of Piper's analysis in 1997 and that the projections were based in part on future data rather than historical financial data, as stated in the Information Statement.

Delaware courts have held repeatedly that a board need not disclose specific details of the analysis underlying a financial advisor's opinion.[59] Moreover, even if

such facts were required to be disclosed, this information would not have altered significantly the total mix of information available to shareholders. The Information Statement clearly states that Piper "reviewed certain information relating to the business of BLC, including earnings, cash flow and liabilities, prospects for BLC and financial forecasts for the years ending December 31, 1997 through 2003, furnished to Piper Jaffray by management of BLC."[60] It also explains that BLC's management created the financial projections by "appl[ying] certain assumptions to the historical financial data, as adjusted."[61] In any case, the shareholders were certainly notified that the projections were based on data supplied to Piper by the management of the Best Companies and the shareholders could draw their own conclusions about how this might affect the final analysis.[62] Accordingly, the motion to dismiss with regard to these claims is granted.

Finally, plaintiffs allege that the Information Statement contains various miscellaneous omissions and misrepresentations. I have carefully reviewed each of these

---

ment, describe in great detail the scope of and basis for Piper's opinions. *Id.* at Annex B.

58. *See, e.g., id.* at 16–18 (discussing Piper's analysis and noting repeatedly that the financial information was prepared by management); *id.* at B–1, B–4, B–7 (stating, in the fairness opinions themselves, that Piper relied on financial information "furnished to us by management of BLC").

59. *See, e.g., Skeen v. Jo–Ann Stores, Inc.,* Del. Supr., 750 A.2d 1170, 1174 (2000) (declining to require that shareholders "be given all the financial data they would need if they were making an independent determination of fair value"); *In re Genentech, Inc. Shareholders Litig.,* Del.Ch., Consol. C.A. No. 11377, slip op. at 17–18, Chandler, V.C., 1990 WL 78829 (June 6, 1990).

60. Information Statement at 16.

61. *Id.* at 18.

62. It is well established that reasonable shareholders can draw their own inferences from the facts disclosed. *See, e.g., Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., C.A. No. 8358, slip op. at 59, Allen, C., 1991 WL 111134 (June 21, 1991, *revised,* June 24, 1991) (subsequent history omitted) ("[C]onclusions that may be drawn from information disclosed need not be disclosed."). The Information Statement repeatedly disclosed that Piper relied on projections provided by management. It also repeatedly disclosed the Bests' potential conflict of interest. *See, e.g.,* Information Statement at 8 (disclosing "Conflicts of Interest"); *id.* at 9 (disclosing "Interests of Certain Persons in the Mergers"); *id.* at 25 (disclosing, once again, "Interests of Certain Persons in the Mergers"); *id.* at 36 (listing all of the positions held by Russell and Mariea Best).

"other" disclosure claims and I note initially that none of them raise an issue that is material or would alter significantly the total mix of information available to the shareholders of the Best Companies. These miscellaneous allegations can be grouped into four main areas: allegations regarding the intent of the management of the Best Companies in structuring the merger, allegations involving details of the financial advisor's opinion, allegations involving hypothetical or prospective statements, and truly miscellaneous allegations. I will address each of these in turn.

■ First, plaintiffs contend that the assertion in the Information Statement that "the Companies structured the transaction in a way to ensure that the Unaffiliated Stockholders of each Company would have dissenter's rights under Delaware law (as compared to accomplishing a similar transaction via a reverse stock split which would not have provided stockholders with the ability to have their shares appraised)" is misleading because it falsely suggests that management intended to benefit the public shareholders by structuring the transaction as it did.[63] This claim is remarkable because the statement in the Information Statement is clearly true. Plaintiffs also assert that management's failure to disclose its view that shareholders accepting the merger consideration should be excluded from the class action by virtue of acquiescence constitutes a material omission.[64] The defendants do not have a duty to provide litigation advice or to disclose litigation strategy. Additionally, Delaware courts have long recognized that a board need not engage in "self-flagellation" and draw legal conclusions from surrounding facts and circumstances implicating itself in a potential breach of fiduciary duty.[65] Thus, defendants need not have disclosed their "true intent" as construed by plaintiffs, nor that management was of the view that stockholders accepting merger consideration should be excluded from participating in a class action challenging the merger.

■ Second, plaintiffs contend that the Information Statement is materially incomplete because it fails to explain why Piper added a 15% premium to its comparable public company analysis or how such a premium was derived.[66] As noted above, Delaware courts have held repeatedly that a board need not disclose specific details of the analysis regarding a financial advisor's opinion.[67] Thus, defendants need not have disclosed the basis for applying a control premium of 15%.

■ Third, plaintiffs claim that the Information Statement should have disclosed the SEC's views of the Freeze–Out Mergers. Defendants need not include information that is prospective or hypothetical in nature, such as the SEC's concerns about the merger that do not constitute a final judgment. Moreover, the Information Statement discloses, as required by law, that "THIS TRANSACTION HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL."[68] This is because the SEC

---

63. Compl. ¶ 137.

64. *Id.* ¶ 143.

65. *See, e.g., Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 143 (1997) ("The directors' duty of disclosure does not

oblige them to characterize their conduct in such a way as to admit wrongdoing.").

66. Compl. ¶ 139.

67. *See supra* note 59.

68. Information Statement at 3.

does not engage in merit-based regulation. In any case, the alleged omission is not material because it would not alter the total mix of information available to the shareholders of the Best Companies.

▆▆▆▆ Finally, the plaintiffs allege three miscellaneous misrepresentations or omissions.[69] First, they claim that the Information Statement misstates the date on which the Freeze–Out Mergers were approved by the Boards of Directors of the Best Companies. Whether this is true or not, I cannot see how this misrepresentation, assuming it is one, would assume significance in the deliberations of any reasonable shareholder. Second, plaintiffs claim that the representation in the Information Statement that the Boards of Directors believed that the multi-tiered structure of the Best Companies is a significant factor in the market's valuation of the Best Companies is misleading because there are other significant factors as well, such as the presence of a controlling shareholder. There is no evidence to support the conclusion that the Boards of Directors did not believe that the ownership structure was a significant factor in the market's valuation of the Best Companies. Moreover, there is no reason to require the defendants to explain minority discounts in the Information Statement. Finally, plaintiffs claim that Piper's valuation was "stale" because it provided a valuation as of December 1, 1997, several months before the Freeze–Out Mergers were consummated. The Information

Statement, however, is dated March 2, 1998, and it includes Piper's fairness opinions, which are dated December 1, 1997. Reasonable shareholders could draw any necessary inference regarding the currency of the valuations from the disclosed information. Thus, for all of the reasons stated above, defendants' motion to dismiss all of the disclosure claims is granted.

*C. Defendants' Acquiescence Defense*

Defendants contend that the claims raised by plaintiffs who have tendered their shares and accepted the merger consideration should be dismissed because those plaintiffs have acquiesced in the Freeze–Out Mergers. Plaintiffs respond by claiming that they did not tender their shares voluntarily and that they were not fully informed when they tendered their shares. I note initially that any plaintiffs who have not tendered their shares will be able to pursue the self-dealing claims in connection with the Freeze–Out Mergers regardless of my decision on this point.

▆▆▆▆ I turn first to the argument that the plaintiffs who tendered their shares after the merger was consummated did not do so voluntarily. Defendants maintain that the plaintiffs had a choice: they could hold their shares and seek appraisal or they could tender their shares for the merger consideration. It is not clear, however, that these alternatives presented the plaintiffs with a meaningful choice.[70] Because of the plaintiffs' allegations of self-dealing on the part of the defendants, the statutory appraisal remedy may be inadequate in this case.[71] As defendants would

69. Compl. ¶ 142.

70. This is different from the situations presented in cases such as *Trounstine v. Remington Rand, Inc.*, Del.Ch., 194 A. 95 (1937), and *Frank v. Wilson & Co.*, Del.Supr., 32 A.2d 277 (1943), in which the plaintiffs could have retained their original rights in the defendant corporations but instead chose to accept the benefits of the challenged transactions. *See Trounstine*, 194 A. at 99–100 (noting that the

plaintiff accepted new rights when he could have retained his old rights); *Frank*, 32 A.2d at 282 ("[Frank] insisted from the first that his Class A shares remained unaffected by the [corporate action], and in this he was ultimately found to be right."). These decisions are discussed in greater detail below.

71. *See Wood v. Frank E. Best, Inc.*, Del.Ch., C.A. No. 16281, slip op. at 13 & n. 25, Chandler, C., 1999 WL 504779 (July 9, 1999).

have it, the plaintiffs would be left with the "choice" between accepting the possibly inadequate merger consideration and pursuing a possibly inadequate appraisal remedy. In a different context, the Delaware Supreme Court has concluded that the absence of a meaningful choice precludes a finding of acquiescence.[72]

Defendants rely on *Trounstine v. Remington Rand, Inc.*[73] and its progeny to support their argument that some of the plaintiffs acquiesced by tendering their shares in exchange for the merger consideration. In *Trounstine*, the defendant corporation reclassified its stock in a way that "extinguish[ed] the right of a dissenting preferred stockholder to receive in cash the arrearages of dividends which had accumulated on his shares as stipulated in the charter."[74] Such a reclassification was "beyond the power" of the corporation and, accordingly, "was a nullity as against a non-assenting shareholder."[75] Nevertheless, Trounstine tendered his old shares, requested the new shares, and accepted several dividend payments.[76]

The Court of Chancery explained that Trounstine could not be deprived of his contractual rights by the corporation in this way, describing Remington Rand's action as "nugatory as to him."[77] The Court noted, however, that the defendant corporation's action was ratifiable.[78] The Court then quoted at length from Fletcher's *Cyclopedia of Corporations* as follows:

> If a majority of the stockholders do or authorize an act as to which it is *not within the power* of the majority to bind the minority, but which would be valid if all consent, stockholders who do not take part may ratify the act, or may be estopped by acquiescence. * * * A stockholder cannot attack a *wrongful or ultra vires act*, where he has accepted pecuniary benefits thereunder, with knowledge of the facts. Acceptance of dividends resulting from the act or thing complained of has in several instances been held to work an estoppel.[79]

The Court then explained that Trounstine waived his old rights by choosing to exchange them for the new rights.[80]

---

**72.** *In re Rubenstein*, Del.Supr., 637 A.2d 1131, 1134 n. 2 (1994) (noting that when accepting one of two inadequate alternatives, "acquiescence cannot be fairly construed as a waiver" of the right to seek an adequate remedy). The same result should hold in this context as well. *Cf. Kahn v. Household Acquisition Corp.*, Del.Ch., C.A. No. 6293, slip op. at 3–4, Brown, V.C., 1982 WL 8778 (Jan. 19, 1982) ("Thus, in accepting payment of the merger price, plaintiff did no more than accept the amount she was powerless to do anything about until such time as she could present her evidence and obtain a decision in this case.... It does not follow that by accepting an amount that she was temporarily unable to do anything about the plaintiff thereby acquiesced in all other conduct of the defendants unrelated to the fixing of the merger price.").

**73.** Del.Ch., 194 A. 95 (1937).

**74.** *Id.* at 99.

**75.** *Id.* at 98, 99.

**76.** *Id.* at 97. Significantly, Trounstine did not tender his shares "until time had demonstrated that what he could receive in exchange for his old stock was worth more on the current market than was the redemption value of his old stock which included all the arrearages thereon." *Id.* at 99.

**77.** *Id.* at 99.

**78.** *Id.* ("It is not to be conceived that if one hundred per cent of the preferred stockholders ... had voted in favor of the amendment, the court would, out of regard for some supposed public policy, have declared the amendment void.").

**79.** *Id.* (quoting 13 Fletcher, *Cyclopedia of Corporations* (perm. ed.) § 5862, p. 179) (emphasis added) (omission in original).

**80.** *Id.*

The choice faced by Trounstine differs from the one faced by the shareholders in the Best Companies in a significant way.[81] In *Trounstine*, the defendant corporation had exceeded its power and engaged in an invalid act. Trounstine therefore could have maintained his original interest in the corporation. Instead, however, he chose to exchange that interest for a different one.[82] In this case, to the contrary, the Freeze–Out Mergers were legally effected, although in a way that raises equitable issues. Once the Boards of Directors and the majority shareholders expressed their approval of the Freeze–Out Mergers, the public shareholders no longer had a legal claim to their former equity interests in the Best Companies.[83] They did not re-

---

81. In this regard, then-Vice Chancellor Brown's interpretation of *Trounstine* in *Kahn v. Household Acquisition Corp.* is worth quoting at length:

> These factors also serve, I think, to distinguish the *Trounstine* case. There the plaintiff voted against a proposal to reclassify his preferred shares and thereafter filed suit to set aside the reclassification. Then, significantly, he dismissed his suit and some months later surrendered his shares in exchange for those authorized by the reclassification. After accepting the benefits of the exchange for several months more, he filed a second suit in his [sic] Court to undo the reclassification. His complaint was dismissed on the basis that by his conduct he had acquiesced in the reclassification scheme and thus was barred from attacking it. (A reading of the decision would indicate that an element of estoppel was also present.)
>
> Had the plaintiff here dismissed her suit, surrendered her shares and accepted the merger price, in the absence of any claim of material misrepresentations, etc., and then reinstituted her cause of action, her situation might well fall under the *Trounstine* rationale. The difference is, however, that defendants are attempting to dismiss her original, ongoing, first-and-only action based solely upon her acceptance of payment of the challenged merger price while her suit was pending. However, the fact that she elected to take payment while pursuing her suit—under protest so to speak—negates the existence of an element critical to the *Trounstine* decision. It belies any thought to acquiescence.

*Kahn*, Del.Ch., C.A. No. 6293, slip op. at 4–5, Brown, V.C., 1982 WL 8778 (Jan. 19, 1982); *see also Clements v. Rogers*, Del.Ch., C.A. No. 15711, slip op. at 32 n. 46, Strine, V.C., 790 A.2d 1222 (Aug. 14, 2001) (noting the "pragmatic approach" taken by then-Vice Chancellor Brown in *Kahn* and by then-Vice Chancellor Walsh in *Serlick v. Pennzoil Co.*, Del.Ch., C.A. No. 5986, Walsh, V.C., 1984 WL 8267 (Nov. 27, 1984)).

82. *Trounstine*'s choice was similar to the choices faced by other plaintiffs barred by acquiescence from pursuing claims in the years following that decision. *Accord Bay Newfoundland Co. v. Wilson & Co.*, Del.Supr., 37 A.2d 59, 64 (1944) (finding it "within the doctrine of acquiescence to hold that assent to a proposed corporate act will be inferred in a case where a stockholder, with full knowledge of an intended invasion of his rights and an opportunity to dissent, stands by during the progress of a proceeding which, although unauthorized, is ratifiable, and allows, without objection, his stock to be dealt with in a manner inconsistent with his rights of ownership"); *Frank v. Wilson & Co.*, Del. Ch., 9 A.2d 82, 88 (1939) (holding, on facts similar to those in *Trounstine*, that a defendant who accepted dividends paid on his new stock after a voidable reclassification thereby acquiesced in the reclassification), *aff'd*, Del. Supr., 32 A.2d 277 (1943). The significant difference between these cases and the claims raised by the public shareholders of the Best Companies lies in the fact that the defendant corporations in these other cases could only deal with the plaintiffs' stock "in a manner inconsistent with [their] rights of ownership" if the plaintiffs did not object. *Bay Newfoundland Co.*, 37 A.2d at 64. In this case, the Freeze–Out Mergers allowed the Best Companies to act in such a way *regardless* of the plaintiffs' objection or lack thereof.

83. Instead, those plaintiffs who chose to forego the statutory appraisal remedy were entitled to receive the merger consideration for their shares regardless of the resolution of any equitable claims they chose to bring. *See Clements*, 790 A.2d at 1238 ("Having abandoned the right to seek a fair value award that was not dependent on a showing of a breach of fiduciary duty, Clements became entitled to

lease their original rights by tendering their shares because those rights had already been extinguished in the Freeze–Out Mergers. Accordingly, *Trounstine* and its progeny cannot stand for the proposition that a minority shareholder frozen out in a merger executed by consent of the majority shareholder acquiesces in the transaction by tendering his, her, or its shares while simultaneously pursuing an equitable claim.

Defendants argue forcefully that the Delaware Supreme Court's decisions in *Bershad v. Curtiss–Wright Corp.*[84] and *Kahn v. Household Acquisition Corp.*[85] compel a different result. Excerpts from these cases, which admittedly suggest the result advocated by the defendants when read in isolation, cannot be considered in a vacuum. When the analysis of *Bershad* and *Kahn* is reviewed in detail and in the context of their factual backgrounds, it becomes clear that those cases are distinct from this one and the defendants' argument loses force.

*Bershad* involved a freeze-out merger conditioned on the vote of a majority of the minority shareholders. Significantly, the plaintiff in *Bershad* did not raise a claim of self-dealing, as in this case;[86] instead, he challenged the adequacy of the disclosure made to the minority shareholders and argued that the freeze-out merger lacked a proper business purpose.[87] On the defendants' motion for summary judgment, the Court of Chancery held that the disclosure had been adequate and that the plaintiff's improper purpose claim failed under *Weinberger v. UOP, Inc.*[88] The only remaining claim was a challenge to the fairness of the price paid in the merger.[89] Then–Vice Chancellor Longobardi considered whether the frozen-out shareholders were entitled to a *Weinberger* quasi-appraisal and ultimately limited the availability of that remedy to those shareholders who would have been able to pursue a statutory appraisal under § 262 of the DGCL had they perfected their appraisal rights.[90]

The Court of Chancery's holding in *Bershad* was unremarkable: only those share-

---

the merger consideration regardless of the outcome of this litigation."). There is no clear policy reason to require plaintiffs seeking to bring an equitable challenge to a freeze-out merger to become, in effect, interest-free lenders to the majority shareholder and the surviving corporation for the duration of the suit.

**84.** Del.Supr., 535 A.2d 840 (1987).

**85.** Del.Supr., 591 A.2d 166 (1991).

**86.** Such a claim would have been difficult to pursue in light of the ratifying vote that had occurred before the merger was consummated.

**87.** *Bershad v. Curtiss–Wright Corp.*, Del.Ch., C.A. Nos. 5827, 5830, slip op. at 1, Longobardi, V.C., 1983 WL 10916 (March 21, 1983).

**88.** Del.Supr., 457 A.2d 701 (1983). *See Bershad*, Del.Ch., slip op. at 14 (granting the defendants' motion for summary judgment).

**89.** *Bershad*, Del.Ch., slip op. at 14 ("[T]he Plaintiffs are in the precarious position of merely challenging the fairness of the $23.00 price.").

**90.** *Id.* at 15. Vice Chancellor Longobardi noted that the financial remedy available to frozen-out shareholders was to be governed by " § 262, as construed by the Supreme Court, including the means for perfecting appraisal rights." *Id.* He then recognized that some plaintiffs who did not perfect their appraisal rights would still be entitled to a quasi-appraisal under *Weinberger, see id.*, particularly because the Supreme Court relaxed the requirements for this remedy in all cases that were pending when *Weinberger* was decided. *Weinberger*, 457 A.2d at 714–15. Ultimately, however, Vice Chancellor Longobardi dismissed the claims of all shareholders who voted in favor of the merger or tendered their shares, thereby limiting the quasi-appraisal remedy to those shareholders who neither voted in favor of the merger nor tendered their shares. *Bershad*, Del.Ch., slip op. at 15.

holders who were eligible to seek appraisal would be eligible to seek a quasi-appraisal. The Court of Chancery did not mention acquiescence, nor did it cite *Trounstine.* Had the Court chosen to do so, the analysis presumably would have been straightforward: those shareholders who relinquished their statutory appraisal rights did so voluntarily and while fully informed; accordingly, the Court would not reinstate those rights in the form of a quasi-appraisal.

The Supreme Court affirmed this decision four years later. The narrow issue addressed by the Supreme Court in the portion of its decision that is relevant to this discussion was whether *Weinberger* provided a quasi-appraisal remedy for all shareholders challenging the fairness of the merger or only those shareholders who neither voted in favor of the merger nor accepted its benefits.[91] The Supreme Court noted that "[t]he thrust of *Weinberger* is to protect those rights of minority stockholders which have been tainted by an element of unfairness," but then cited *Trounstine* to support the assertion that "when an informed minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness."[92] The Supreme Court concluded that "[s]ince Bershad tendered his shares and accepted the merger consideration, he acquiesced in the transaction and cannot now attack it."[93] This sentence was the extent of the Court's discussion of acquiescence.

The Supreme Court's analysis, however, is consistent with the interpretation of *Trounstine* set forth above. The plaintiffs in *Bershad* were challenging only the fairness of the price paid in the merger. Those plaintiffs would have been entitled to do exactly that in a statutory appraisal action if they had perfected their appraisal rights rather than voting in favor of the merger or tendering their shares. By voluntarily and knowingly exchanging their shares (and their appraisal rights) for the merger consideration, however, plaintiffs like Bershad lost any right in equity to seek a quasi-appraisal. The result in *Bershad* would, in my opinion, have been different had the plaintiffs raised a colorable duty of loyalty claim, as the plaintiffs in this case have done,[94] or if there had not been a ratifying vote of the minority shareholders.

■ The Supreme Court's decision in *Kahn v. Household Acquisition Corp.,* when considered in context, is no more helpful for the defendants. As in *Bershad,* the defendants in *Kahn* did not breach their fiduciary duties in connection with the freeze-out merger at issue and the plaintiffs were left challenging only the fairness of the price paid.[95] The Court of Chancery again limited its decision to the narrow question of the availability of a *Weinberger* quasi-appraisal, concluding

91. *Bershad,* Del.Supr., 535 A.2d at 848.

92. *Id.*

93. *Id.*

94. Significantly, the Supreme Court cited *Rabkin v. Philip A. Hunt Chemical Corp.,* Del. Supr., 498 A.2d 1099 (1985) to support the proposition that *Weinberger* protects shareholders from unfairness. 535 A.2d at 848. The portion of *Rabkin* cited by the Court acknowledges that *"Weinberger*'s concern for

entire fairness loses all force" if shareholders are forced to seek appraisal as an exclusive remedy when they raise claims of self-dealing. 498 A.2d at 1108. The implications of this are discussed in greater detail below. For now it is sufficient to note that cases involving unfair dealing, such as this case, are different from *Bershad.*

95. In *Kahn,* the Supreme Court noted this similarity, describing *Bershad* as "also a quasi-appraisal case preserved under *Weinberger*'s window." 591 A.2d at 176.

that under *Bershad* those shareholders who voted in favor of the merger and those who tendered their shares could not obtain a quasi-appraisal absent unusual facts.[96] Significantly, the Court of Chancery distinguished the quasi-appraisal claim from an entire fairness claim, implying that shareholders excluded from a quasi-appraisal may still have had standing to pursue an entire fairness claim.[97]

The Supreme Court affirmed the decision of the Court of Chancery in *Kahn*, concluding that the directors did not breach their fiduciary duties and prohibiting shareholders who voted in favor of the merger from seeking a quasi-appraisal. The Supreme Court reversed the Court of Chancery, however, to the extent that it precluded shareholders who tendered shares between the consummation of the merger and the Court's 1982 decision from sharing in the quasi-appraisal award. Because of the "unusual history and circumstances" of the case, the Supreme Court held, all members of the class who tendered their shares after consummation of the merger would be entitled to participate in the increased quasi-appraisal valuation.[98]

The *Kahn* decision, unlike the *Bershad* decision, did contain a discussion of acquiescence, but much of that discussion focused on the particular facts of that case. Nothing in that discussion is inconsistent with the reasoning set forth above. The Supreme Court did note, however, that before a plaintiff's claim will be barred by acquiescence, it must be shown that the plaintiff engaged in "inequitable conduct that precludes assertion of rights to attack the underlying merger." [99] No such showing has been made in this case.

Moreover, in this case an essential element of acquiescence—that the acquiescing party shows unequivocal approval of the transaction [100]—is lacking: the fact that plaintiffs tendered their shares while

96. *Kahn v. Household Acquisition Corp.*, Del. Ch., C.A. No. 6293, slip op. at 4, Berger, V.C., 1990 WL 26163 (March 1, 1990). Then–Vice Chancellor Berger held that a fully informed minority shareholder voting in favor of a freeze-out merger thereby acquiesces in the transaction *"if the merger price is the only issue." Id.* (emphasis added). She also held that *Bershad* required that "those former minority stockholders who tendered their shares in exchange for the merger consideration be excluded from the quasi-appraisal remedy." *Id.* Ultimately, however, the Court of Chancery allowed minority shareholders who tendered their shares after 1982 to participate in the quasi-appraisal because of the peculiar law of the case.

97. The Court noted then-Vice Chancellor Brown's earlier decision in *Kahn*, in which he held that Kahn still had standing to bring an entire fairness claim despite tendering her shares. *Id.* at 5. Reasoning that "other Wien stockholders may have understood the 1982 decision as permitting them to surrender their shares without sacrificing *any* claim," the Court allowed shareholders who tendered their shares after the announcement of that decision to participate in the quasi-appraisal. *Id.* The logic behind this portion of the opinion is clear: by tendering their shares, minority shareholders lose their right to seek quasi-appraisal because of the acquiescence doctrine after *Bershad*. They do not, however, lose the right to bring an entire fairness claim. Because this distinction was unclear in 1982 (and indeed until *Bershad* was decided in 1987), certain shareholders were allowed to participate in the quasi-appraisal despite the Supreme Court's earlier holding in *Bershad*.

98. 591 A.2d at 177–78.

99. *Id.* at 177.

100. *Clements v. Rogers*, Del.Ch., 790 A.2d 1222, 1238 n. 46 (2001) ("Traditionally, the doctrine of acquiescence has included a showing that the plaintiff, by words or deed, has acknowledged the legitimacy of the defendants' conduct."); *Frank v. Wilson & Co.*, Del.Ch., 9 A.2d 82, 87 (1939) ("In equity, in order for acquiescence to operate as a bar to a complainant's action, knowledge of the act complained of is necessary, but when he freely does something which fairly and reasonably amounts to a recognition of the validity of that act, and which is inconsistent with its

simultaneously pursuing this action "belies any thought to acquiescence."[101] The plaintiffs first filed suit in March of 1998, the same month in which they received the Information Statement. Since then, they have continued to pursue various claims of self-dealing by the defendants both before and during the Freeze–Out Mergers. The defendants could not reasonably think that the plaintiffs approved of the mergers simply because they tendered their shares "under protest" while maintaining this suit.[102] Accordingly, I cannot agree with the defendants that plaintiffs who tendered their shares acquiesced in the Freeze–Out Mergers.

The result advocated by the defendants would be anomalous for several other reasons in addition to those discussed previously.[103] Requiring shareholders to engage in the purely formalistic act of keeping their shares would effectively force any shareholders who were unhap-

py about a merger to seek appraisal—there would be no reason not to do so if they had to keep their shares (which is the risk borne by plaintiffs in appraisal actions) in order to bring an equitable claim—even though neither the Legislature nor the court has determined that appraisal is an exclusive remedy.[104] To the contrary, in fact, Delaware courts have held repeatedly that appraisal is not a shareholder's only remedy in this situation.[105]

 Allowing acceptance of the merger consideration in a freeze-out merger to extinguish equitable claims would also be inconsistent with *Kahn v. Lynch Communication Systems, Inc.*[106] Under *Kahn v. Lynch*, a ratifying vote by a majority of the minority shareholders of a transaction with the majority shareholder does not extinguish equitable claims, but only switches the burden of proving fairness to the plaintiffs.[107] This is presumably true

---

subsequent repudiation, a real conscious intent to approve or ratify it is not essential to that defense."). *Cf. Kahn,* slip op. at 3, Brown, V.C., 1982 WL 8778 (Jan. 19, 1982) (refusing to conclude that the plaintiff acquiesced in a cash-out merger by tendering her shares "because she did so while her suit attacking the merger was pending and being actively pursued by her"). In a different context, Delaware courts only apply the doctrine of acquiescence upon a "clear and decisive" showing of intent to acquiesce. *Falcon Steel Co. v. HCB Contractors, Inc.,* Del.Ch., C.A. No. 11557, slip op. at 11, Hartnett, V.C., 1991 WL 50139 (Apr. 4, 1991) (discussing acceptance of the benefits of a judgment as acquiescence in the judgment and waiver of the right to appeal).

101. *Kahn,* Del.Ch., slip op. at 5, Brown, V.C., 1982 WL 8778 (Jan. 19, 1982).

102. *Id.*

103. *See Clements,* 790 A.2d at 1238 & n. 46 (noting and discussing some of these anomalies).

104. *See, e.g., Turner v. Bernstein,* Del. Ch., 776 A.2d 530, 546 (2000) ("The General Assembly

could easily write the language [of § 262] to make [appraisal an exclusive remedy]; to date, it has not.").

105. *See, e.g., Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1107–08 (1985) (noting "the imperfections of an appraisal where circumstances of this sort are present" and acknowledging that maintaining appraisal as an exclusive remedy would be "anomalous" and would make *"Weinberger's* concern for entire fairness lose[ ] all force"); *Cede & Co. v. Technicolor, Inc.,* Del.Ch., C.A. No. 7129, slip op. at 2, Allen, C., 1987 WL 4768 (Jan. 13, 1987, *revised,* Jan. 20, 1987) (holding that a plaintiff seeking appraisal "is not foreclosed by Section 262 or by the case law of this state from filing an action seeking rescission or other equitable relief").

106. Del.Supr., 638 A.2d 1110 (1994); *see Clements,* 790 A.2d at 1238 (describing this inconsistency).

107. 638 A.2d at 1117 ("[A]pproval of [a cash-out merger by a controlling shareholder] by an independent committee of directors or an informed majority of minority shareholders

even if *all* of the minority shareholders vote in favor of the transaction. Thus, in a cash-out merger conditioned on a vote of approval by a majority of the minority shareholders, self-dealing fiduciaries obtain only limited benefits by using the protective mechanism of shareholder ratification: the transaction is still subject to entire fairness review, but the burden shifts to the plaintiffs to prove that the transaction was *not* entirely fair. The rationale for this doctrine is that minority shareholders might be coerced into voting in favor of the transaction out of fear of retribution by the majority shareholder.[108]

If this is the logical basis for our law, there are important implications for situations like this one. It would be a very strange result indeed if a unanimous ratifying vote of the minority shareholders (when they were still in a position to prevent the merger from happening, if the merger were conditioned on the ratifying vote) did not extinguish an equitable claim but the simple act of tendering shares once the merger was consummated did. Regardless of the potentially coercive atmosphere undercutting its legitimacy, a ratifying vote seems both to be more voluntary and to provide more unequivocal approval of a transaction than tendering shares in the face of a Hobson's choice between pursuing a potentially inadequate appraisal remedy and accepting potentially unfair merger consideration tainted by self-dealing. Majority shareholders who elect to freeze out minority shareholders should not be made better off by choosing to forego protective structural mechanisms. Stated differently, acquiescence (or ratification *implied* from the actions of shareholders) should not be given greater

force than explicit ratification. It would be anomalous, to say the least, to extinguish equitable claims based on implied approval (or acquiescence) when such claims are not extinguished by explicit approval (or ratification). Under defendants' interpretation of *Bershad* and *Kahn*, however, any fully informed shareholder who tendered shares would be barred from pursuing an equitable claim, even if that shareholder explicitly disapproved of the transaction. This cannot be the proper result.

Because I have determined that the plaintiffs did not voluntarily tender their shares in a way that showed their approval of the Freeze–Out Mergers, I need not reach plaintiffs' argument that the defendants must prove the accuracy and completeness of the Information Statement before I can conclude that the plaintiffs were fully informed when they tendered their shares. Defendants' motion to dismiss the claims of plaintiffs who have tendered their shares is denied.

## V. COUNT II: BREACH OF FIDU-CIARY DUTIES IN CONNECTION WITH THE CHALLENGED SALE

In Count II of the consolidated complaint, plaintiffs allege that the Bests breached their fiduciary duty of loyalty and good faith in connection with the Challenged Sale of 23,000 shares of FEB by BLC to a separate company, WEBCO, controlled by the Bests. The Challenged Sale, plaintiffs assert, served to transfer control over BUL and BLC from the public shareholders to the Bests who would not otherwise have had the voting power to consummate the Freeze–Out Mergers.

---

shifts the burden of proof on the issue of fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff."); *see also Solomon v. Armstrong,* Del.Ch., 747 A.2d 1098, 1116–17 (1999) (discussing the holding of *Kahn v. Lynch* ).

108. *See, e.g., Citron v. E.I. du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 502 (1990) (explaining this rationale).

Resolution of this issue will require the Court to answer for the first time this key question: What shares are entitled to vote for the purposes of Section 160(c) of the DGCL [109] in a cross-ownership structure in which two (or more) corporations each own a majority of the shares issued by the other? Additionally, the Court must answer the following question: May transactions that avoid the effect of Section 160(c) nevertheless still implicate claims for breach of a director's duty of loyalty and good faith?

> Specifically, plaintiffs allege that Russell and Mariea Best breached their fiduciary duties of loyalty and good faith to BLC and its public stockholders by divesting the public stockholders of control of the Best Companies, and delivering it to themselves, through the sale by BLC of 23,000 shares of FEB stock to WEBCO on August 25, 1997.[110]

The public stockholders' control of the Best Companies allegedly resulted from the action of Section 160(c) of the DGCL. As will be fully explained below, Section 160(c) generally nullifies the voting power of a corporation's capital stock when that corporation directly owns shares of its own capital stock (treasury stock) or could control the voting of its own stock indirectly through a majority-owned subsidiary.[111] The plaintiffs contend that there were periods of time during which each of the Best Companies was both a parent and a majority-owned subsidiary of the other two Best Companies due to a circular parent-subsidiary arrangement among the three companies.[112] When such a circle of majority ownership existed, plaintiffs allege, the effect of Section 160(c) was to "sterilize" the voting power of shares of any of the Best Companies owned by any other Best Company.[113] As a result of that sterilization, the public shareholders possessed the majority of the shares entitled to vote in BUL and BLC, thereby gaining voting control over those two companies.[114]

The defendants respond that there was never any point at which the alleged circular majority ownership structure subject to Section 160(c) sterilization could have existed. In their view, there was one section of the circle that was never closed for purposes of the statute. The defendants insist that shares of FEB owned by BLC were at all times sterilized by Section 160(c). Therefore, BLC never owned a majority of FEB shares "entitled to vote" in the election of directors as required to trigger the Section 160(c) sterilization of the BLC shares owned by FEB. That being the case, the circle of majority voting control among the three Best Companies never closed, the public shareholders' voting percentages were not affected by the sale of 23,000 shares of FEB from BLC to WEBCO and, consequently, the public shareholders of BUL and BLC never gained voting control over those companies.

### A. The History of Section 160(c)

█ It is a long-standing tenet of corporate jurisprudence that shares issued by a corporation that are owned or controlled

---

109. 8 *Del. C.* § 160(c) (2001). This section of DGCL is quoted in full at pages 50–51, *infra*.

110. Compl. ¶ 164.

111. *See Uni–Marts, Inc. v. Stein*, Del.Ch., C.A. Nos. 14713, 14893, slip op. at 15, Allen, C., 1996 WL 466961 (Aug. 12, 1996) ("Section 160(c) of the Delaware General Corporation Law codifies and specifies a judicially created rule that prohibits corporations from voting the company's own stock held in its treasury or otherwise owned by the corporation directly or indirectly.").

112. Compl. ¶ 1(a).

113. *Id.* ¶ 2.

114. *Id.*

by that same corporation do not have voting rights. This common law rule was established to prevent incumbent corporate directors from using their office to control the vote of such shares, thereby leading to self-perpetuation and board entrenchment.[115] The absence of this rule would permit corporate directors to "deprive the true owners of the corporate enterprise of a portion of their voice in choosing who shall serve as directors in charge of the management of the corporate venture."[116] Over time both our common law and our Legislature have responded to changed forms of corporate governance in order to thwart novel attempts by incumbent boards to evade the strictures of this rule.[117]

Delaware's current version of this rule is embodied in Section 160(c) of the DGCL and states in its entirety as follows:

Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.[118]

■ The statute not only prevents a company from voting its own treasury shares,[119] but also its own shares determined to "belong to" that company.[120] Shares "belong to" a company for Section 160(c) purposes when they are held by another company in which the issuer owns a direct majority interest[121] or when their

---

115. _See Speiser v. Baker_, Del. Ch., 525 A.2d 1001, 1009–10 (1987). In this opinion, then-Chancellor Allen recorded an extensive history of the purpose behind Section 160(c) and similar statutes through an examination of relevant cases decided in this country from as early as 1826.

116. _Id._ at 1009.

117. _Id._ at 1010. For example, the changes in corporate law at the end of the nineteenth century permitting corporations to own stock in other corporations, thereby leading to the advent of subsidiaries, opened the door to a novel way of avoiding the rule and, thereafter, "the mischief addressed by Section 160(c) and its predecessors became feasible through the use of a separate corporation." _Id._ The door to this "mischief," opened by that statutory change, was then closed by the courts. In _Italo Petroleum Corp. of America v. Producers Oil Corp._, this Court applied the rule to a parent-subsidiary situation when it determined that such an arrangement was contemplated by the language of an earlier statutory version of Section 160(c) which stated that " 'shares of its own capital stock belonging to the corporation shall not be voted upon directly or indirectly.' " Del.Ch., 174 A. 276, 278 (1934) (quoting section 19 (Rev.Code 1915, § 1933, as amended by 36 Del. Laws, c. 135, § 10)).

118. _8 Del. C._ § 160(c) (2001).

119. _See Agranoff v. Miller_, Del. Ch., 734 A.2d 1066, 1071 (1999) (noting that "the State's public policy as set forth in 8 _Del. C._ § 160(c) ... generally prevents corporations from voting their own stock").

120. _See Haft v. Dart Group Corp._, Del.Ch., C.A. No. 14685, mem. op. at 1, Allen, C., 1997 WL 154049 (March 14, 1997) ("Literally, Section 160(c) provides that shares of a corporation's stock 'belonging to' a corporation may not be voted in the election of that corporation's board or otherwise. Treasury stock is the classic example of shares not entitled to vote due to Section 160(c), but Section 160(c) applies to shares held in other ways than in an issuer's treasury.").

121. _See McDermott Inc. v. Lewis_, Del.Supr., 531 A.2d 206, 212 (1987) (noting that Section 160(c) prevents a Delaware corporation which is a majority-owned subsidiary from voting shares it owns in its parent corporation); _see also Viele v. Devaney_, Del. Ch., 679 A.2d 993, 997 (1996) ("A wholly-owned subsidiary is not permitted to vote its stockholdings in a parent company.").

voting could be controlled indirectly, either through a multi-tiered subsidiary structure or in some other manner.[122] It is through such a multi-tiered subsidiary structure that the plaintiffs contend Section 160(c) acted to transfer voting control from the corporate parents to the public shareholders of two of the three Best Companies.

## B. The Parties' Contentions

FEB was the top-tier parent of the three Best Companies. For all periods pertinent to this litigation, FEB held a majority interest in BUL that in turn held a majority interest in BLC. The plaintiffs acknowledge in their complaint that Russell Best gained voting control over FEB,

and therefore BUL and BLC, through transactions executed on May 18, 1994.[123] After this consolidation of control, however, the plaintiffs allege two periods of time during which BLC became a majority owner of FEB for the purposes of Section 160(c).[124] Plaintiffs contend that BLC's majority ownership of FEB created a circle of majority ownership among the three Best Companies in which each of those companies was both a parent to and subsidiary of the other two companies. This closing of the majority ownership circle purportedly led to the sterilization of all shares of any Best Company owned by any other Best Company and resulted in the transfer of voting control of BUL and

---

**122.** *See* Comment to the 1970 amendment to Section 160 (*quoted in* 2 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 160, at V–47 (3d ed. 1998)) ("Before the [1970] amendment, this section prohibited a corporation from voting its own stock and prohibited a directly controlled subsidiary from voting stock of its parent. The amendment extends the prohibition to indirectly controlled (e.g. second and third tier) subsidiaries."); 1 Rodman Ward, Jr. et al., *Folk on the Delaware General Corporation Law* § 160.1, at GCL–V–119 (4th ed. 1999) ("Section 160 has been amended on several occasions since the 1967 comprehensive revision of the statute. The 1970 amendments to section 160 specified that the voting prohibition now contained in section 160(c) extends to subsidiaries whose voting stock is held 'directly or indirectly' by the parent corporation. This makes it clear that stock of a parent corporation held by a second- or third-level subsidiary is disenfranchised, as is stock held by a first-level subsidiary. The evil to be averted is the same whether the parent's stock is held by a first or by a subsequent tier subsidiary.") (footnote omitted).

**123.** Compl. ¶¶ 32–33.

**124.** Plaintiffs first argue that shares of FEB owned by BLP could be construed as "belonging to" BLC for the purpose of Section 160(c) sterilization due to BLC's 87% equity interest

in BLP beginning on February 15, 1995. Defendants point out that BLC's interest in BLP was merely an equity interest. They state that BLC had no voting rights whatsoever in BLP. BLC could not force the dissolution of BLP and subsequent distribution of FEB shares held by BLP because the other general partners of BLP, Russell Best and WEBCO, could have elected to continue BLP without dissolution even upon the withdrawal of BLC. Therefore, the defendants conclude, any shares of FEB owned by BLP did not "belong to" BLC for Section 160(c) purposes.

The second point in time during which the plaintiffs insist BLC gained a majority of FEB shares was some instant in time on August 25, 1997 between (1) the dissolution of BLP and later proportional distribution of FEB shares held by the partnership to its general partners and (2) the sale of 23,000 shares of FEB from BLC to WEBCO. The plaintiffs assert that the first transaction was consummated for tax purposes and the second to cure the circular ownership problem caused by the first transaction. The defendants counter that both transactions were consummated for the same reason, tax benefits, and should be viewed as a single, unified transaction by operation of the step-transaction doctrine. So viewed, there was not a time when BLC, even briefly, held a majority of FEB's shares. A resolution of this dispute over when BLC might have owned a majority of the issued FEB stock is irrelevant, however, if it is determined that the plaintiffs are incorrect in their assertions

BLC from their corporate parents (FEB and BUL respectively) to their minority public shareholders.

The plaintiffs allege that in response to this development Russell and Mariea Best breached their fiduciary duty to the public shareholders by causing BLC to sell just enough FEB shares to reduce BLC's ownership of FEB below the Section 160(c) triggering level of greater than fifty percent.[125] The sale served to break the circle of majority ownership among the Best Companies and, according to plaintiffs, transferred control of BUL and BLC from the public shareholders of those companies back to their respective corporate parents. Once again, Russell Best was in control of all of the Best Companies through his control of a majority of FEB's voting stock.

Defendants counter that the circular sterilization model put forth by the plaintiffs could not have occurred here because any shares of FEB owned by BLC were at all times sterilized by Section 160(c). Therefore, the public *never* gained control of BUL and BLC because BLC never owned the "majority of the shares entitled to vote for the directors of [FEB]" necessary to trigger the statutory sterilization asserted by plaintiffs.

### C. The Language and Purpose of Section 160(c)

■ I must first address the defendants' argument that BLC's ownership of FEB shares never constituted a "majority of the shares entitled to vote in the election of directors of [FEB]" to trigger the sterilizing effect of Section 160(c), for were I to find it persuasive the other issues raised by the plaintiffs with respect to *when* the alleged circular sterilization could have occurred become moot. The language of Section 160(c) which is key to my decision in this case is: "[s]hares of its own capital stock belonging to ... another corporation, if a majority of the *shares entitled to vote in the election of directors* of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes."

When interpreting a statute, the Supreme Court of Delaware has observed that:

> the fundamental rule is to ascertain and give effect to the intent of the legislature. If the statute as a whole is unambiguous, there is no reasonable doubt as to the meaning of the words used and the Court's role is then limited to an application of the literal meaning of the words.[126]

Section 160(c)'s language is clear. Before any sterilization of shares occurs through the action of Section 160(c), a corporation must own "a majority of the shares entitled to vote in the election of directors." Indeed, the plaintiffs understand the critical importance of the difference between the mere ownership of a share of stock, or even a majority of the shares issued, and the ability to vote those shares for control purposes. Their entire argument is that there were times when the public shareholders of BUL and BLC had voting control over those two companies. The plaintiffs assert that during these times the public shareholders, who only owned a minority of the shares *issued*

as to the action of Section 160(c) upon any shares of FEB owned by BLC.

125. Compl. ¶¶ 83, 105. The sale of 23,000 shares of FEB by BLC to WEBCO (controlled by Russell Best) caused BLC's ownership of FEB stock to drop to 49.5%.

126. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1246 (1985) (citations omitted); *see also Insituform of N. Am. v. Chandler*, 534 A.2d 257, 264 (1987) ("[W]here the language of a statute is clear, a court's function is only to apply that clear command").

by BUL and BLC, held a majority of the shares of those two companies which were *entitled to vote*. The public control over BUL and BLC, it is argued, resulted from Section 160(c) sterilizing the voting power of the shares of BUL and BLC held by their parent companies, FEB and BUL, respectively. This left the public shareholders with the only shares entitled to vote and transformed their minority *equity* interest into a majority *voting* interest.

When arguing that the public shareholders of BUL and BLC had control over those companies, the plaintiffs correctly focus on the number of shares entitled to vote, not merely on the percentage of issued shares owned by the public. When arguing for circular sterilization, however, the plaintiffs ignore the question of whether the FEB shares owned by BLC were entitled to be voted by BLC and, instead, look only to the percentage of the issued FEB shares owned by BLC. Section 160(c) is triggered by "a majority of the shares *entitled to vote* in the election of directors," not by raw ownership of a majority of the shares issued by a corporation. The Legislature made the distinction between these two kinds of "majority" ownership interests with the language it chose to include in Section 160(c) and this Court will not ignore that distinction.

In their complaint, the plaintiffs acknowledge the action of Section 160(c) sterilizing the shares of FEB owned by BLC. The structure of the Best Companies at all times pertinent to this action was such that FEB owned greater than 70% of the shares entitled to vote in the election of directors of BUL. BUL in turn owned greater than 70% of the shares entitled to vote in the election of directors of BLC. Therefore, as a second-tier subsidiary of FEB, *any* shares of FEB owned by BLC would be subject to Section 160(c) and would "neither be entitled to vote nor be counted for quorum purposes." [127] Additional shares of FEB, whether attributed to BLC during the period of BLP's existence or owned directly by BLC during some imagined instant in time between the dissolution of BLP and the Challenged Sale, would also be sterilized in this manner.

■ Although the literal meaning of the words of the statute serves as the foundation upon which a court is to apply the facts of the case, a final determination should not be made "until the court has attempted to understand the *purposes* sought to be achieved by the legislative branch and the words chosen interpreted sympathetically to the achievement of that end." [128] Assuming for argument's sake that the meaning of "shares entitled to vote" was not clear and was not subject to literal application, I would be directed to ascertain the purpose behind the statute to guide my interpretation.[129] An examination of that purpose, in my opinion, supports a literal interpretation of the clear meaning of the statute.

---

127. For the sake of completeness, I note that as a first-tier subsidiary of BUL, shares of BUL owned by BLC were also always sterilized and not eligible to be voted. I also note that as a first-tier subsidiary of FEB, had BUL owned any shares of FEB, which it did not, those shares would always be sterilized by Section 160(c) as well.

128. *Uni–Marts, Inc.*, slip op. at 16 (emphasis added).

129. *See Insituform of N. Am., Inc.*, 534 A.2d at 264 ("[W]here the language chosen leaves it unclear whether it was the legislature's intent to apply the statute in circumstances of the kind presented or leaves it unclear as to how that language should be applied, then a court should place such construction on the words *as will be most consistent with the legislative purpose* in enacting the statute.") (emphasis added).

The voting restrictions contained in Section 160(c) are intended to prevent, as a means of board entrenchment, the use of corporate assets by an incumbent board to purchase stock of its corporation, either by that corporation or by another entity controlled by it, which those directors could then cause to be voted in their favor. To state this more bluntly, Section 160(c) prevents directors from using corporate assets to buy votes for themselves. This Court has had previous occasions to acknowledge this purpose. In *Uni–Marts, Inc. v. Stein*, for example, the Court stated that "[t]he obvious risk that such statutes are directed against is the use of the corporation's own capital to affect the outcome of the election of directors by the shareholders of the corporation." [130] The following year we reiterated:

> The central evil that both the cases upon which statutes such as Section 160(c) are premised and to which the statute itself is directed, is the use of the corporation's own capital to allow incumbent corporate directors to control the voting of the corporation's stock. Such arrangements deprive holders of the company's voting securities of their proportionate voice in the governance of the enterprise. In their various guises, such arrangements have been condemned by American courts for almost two centuries.[131]

The result described above fulfills the purpose of the statute in that the directors of FEB would not be permitted to cause FEB's shares owned by BUL, its second-tier subsidiary, to be voted according to the wishes of FEB's directors. That purpose, however, is not further advanced by the plaintiffs' corollary assertion that the sterilized shares of FEB owned by BLC are somehow "entitled to vote" when applying Section 160(c) to the other Best Companies with the result that FEB becomes a majority-owned first-tier subsidiary of BLC. This theory would lead to the inequitable and anomalous result that the shares of the parent company owned by the subsidiary are sterilized *and the shares of the subsidiary owned by the parent are also sterilized.* Under plaintiffs' view, the parent company not only loses the ability to vote its shares owned by the subsidiary, as contemplated by the statute, but also loses voting control over its subsidiary as well. Accepting this contention leads to a result that could not have been intended by the Legislature and does not advance the statute's purpose.

To illustrate the inequity that would result if the plaintiffs' view of Section 160(c) were accepted, consider the further implications of their argument. As plaintiffs would have it, Section 160(c) would sterilize the BUL shares held by FEB and the BLC shares held by BUL. The purpose of the statute, as noted above, is to prevent entrenchment of directors who might try, directly through treasury stock or indirectly through a subsidiary or otherwise, to

---

130. *Uni–Marts, Inc.*, slip op. at 15.

131. *See Haft v. Dart Group, Inc.*, mem. op. at 20–21; *see also Insituform of N. Am., Inc. v. Chandler*, 534 A.2d at 272 n. 12 ("Speaking very generally, § 160(c) prevents a corporation from voting its own stock. It is a provision designed to prevent those in control of a corporation from using corporate resources to perpetuate themselves in office."); *Speiser v. Baker*, 525 A.2d 1001, 1009 (1987) (" 'It is not to be tolerated that a Company should procure stock in any shape which its officers may wield to the purposes of an election; thus securing themselves against the possibility of removal.' ") (quoting *Ex Parte Holmes*, N.Y. Sup.Ct., 5 Cow 426, 435 (1826)); *Folk on the Delaware General Corporation Law* § 160.2, at GCL–V–120 ("Absent [the] prohibitions [of § 160(c) ], the shares could be voted so as to effect directly a self-perpetuation of the incumbent board of directors or their nominees and to control other types of corporate action requiring a stockholder vote.").

cause shares of their corporation to be voted in their favor. This purpose is fulfilled when the shares of FEB held by BLC are sterilized. Further sterilizing the shares of BUL held by FEB and the shares of BLC held by BUL unfairly penalizes FEB and BUL by causing them to forfeit control of their subsidiaries. The result of this forfeiture would be that the public shareholders of FEB would lose the benefit of their investment because the only asset of the company in which they invested, FEB, would be the now-sterilized shares of BUL. Additionally, the public shareholders of BUL and BLC, who only owned 14% and 20% of those corporations, respectively, would then own a majority of the shares of BUL and BLC entitled to vote. FEB's loss of control of BUL and BUL's loss of control of BLC would be harsh additional results when the purpose of the statute had already been fulfilled with the sterilization of the FEB shares held by BLC. Furthermore, while innocent public shareholders of FEB would lose the value of their investment in FEB, the public shareholders of BUL and BLC would receive an unwarranted windfall by the sudden transformation of their less than 20% equity interest into a majority voting interest in BUL and BLC. Such an inequitable redistribution could not have been the intention of the Legislature when it enacted Section 160(c).[132]

The correct result in this case is that FEB still controls 78% of the voting power of BUL, BUL retains control over 79% of the voting power of BLC, and the public shareholders maintain their minority interests in all three companies. Section 160(c) sterilizes the shares of FEB owned by BLC, leaving approximately 46% of FEB's outstanding shares "entitled to vote." This leaves Russell Best with a majority of the FEB shares entitled to vote despite his ownership and control of only approximately 28% of the equity of FEB. The action of Section 160(c) transforms the individual defendants' ownership of less than 30% of FEB's equity into a majority-voting block in all three Best Companies. This result is entirely consistent with the language and purpose of Section 160(c).

■■■ As this Court acknowledged in *Uni–Marts*, however,

to say that these allegations do not state [a] claim for violation of Section 160 of the DGCL is not at all the same as saying that they are may not be [sic] the proper subject of equitable relief.... When courts are faced with facts that properly invoke the equitable obligation of corporate fiduciaries (*i.e.*, plausible claims of self-dealing in its many guises), they tend not to employ a formal style of analysis. Thus the fiduciary duty of corporate officers and directors remains as

---

**132.** Under the plaintiffs' interpretation of Section 160(c) an even more inequitable result is conceivable: a director owning, for example, 25% of a public company could cause a majority-owned (say, 90%) subsidiary to purchase a majority (51%) of the company's stock, with the result that the director becomes the owner of a majority of shares entitled to vote. This result, which is uncontested in this action, is required by the operation of Section 160(c). The director's use of Section 160(c) to increase his voting strength and gain control of both companies might well constitute a breach of his fiduciary duty of loyalty and good faith, and may ultimately lead to his liability as a director of the parent company. This does not, however, change the fact that the shares of the parent owned by the subsidiary were sterilized by the action of Section 160(c) and were "not entitled to vote" so as to trigger further sterilization of shares of the subsidiary owned by the parent. Under the plaintiffs' interpretation of Section 160(c), however, the parent's shares of the subsidiary would also be sterilized, with the result that holders of the remaining 24% of the company's stock would be disadvantaged while minority shareholders in the subsidiary (who own only 10% of the equity) would obtain a significant windfall.

the background protection to shareholder interests against arrangements that, while not violating the language of Section 160(c), nevertheless do improperly deploy corporate assets for the purpose of controlling the vote of the corporation's own stock.[133]

Here, Russell and Mariea Best engaged in a course of conduct intended to use the assets of companies under their control to leverage their voting power through the effects of Section 160(c). Although claims relating to many of the transactions they entered into are time-barred, the Challenged Sale nevertheless raises equitable issues that will survive a motion to dismiss. Because the Challenged Sale was clearly a self-dealing transaction with no protective measures taken, the defendants will bear the burden of proving that the price paid was entirely fair. The Challenged Sale may raise other equitable issues as well. For example, BLC's majority equity interest in FEB, although not a controlling interest in the hands of BLC because of the operation of Section 160(c), would have been a controlling interest in the hands of anyone outside the chain of ownership in the Best Companies. The sale of a small portion of that interest at a modest premium in a self-dealing transaction may implicate the directors' duty of loyalty and good faith.

Applying Section 160(c) correctly and in accordance with its language and purpose, it is clear that BLC never owned a majority of FEB shares entitled to vote in the election of directors as required to trigger Section 160(c) sterilization.[134] The plaintiffs' arguments regarding Section 160(c)'s application to the facts of this case are contrary to a literal reading of the statutory language and not consistent with the policy concerns that animate the statute. Therefore, I conclude, as a matter of law, that Count II of the consolidated complaint does not state a claim as to a transfer of control to and from the public shareholders through the sterilization by Section 160(c) of all shares of any Best Company owned by any other Best Company. The complaint does, however, allege facts which if accepted as true could state a claim for breach of a fiduciary duty of loyalty and good faith, a claim already encompassed, in my opinion, by the surviving portions of Count I of plaintiffs' consolidated complaint.

At a later stage in these proceedings, it will therefore be the defendants' burden to demonstrate that the process of implementing these transactions, as well as the resulting merger consideration, were entirely fair to the minority public stockholders.

## V. COUNT III: THE REVLON CLAIM

In Count III of the consolidated complaint, plaintiffs contend that Russell and Mariea Best are liable for breach of their

---

133. Del.Ch., C.A. Nos. 14713, 14893, slip op. at 20–21, Allen, C., 1996 WL 466961 (Aug. 12, 1996).

134. Because of this determination, it is unnecessary to reach the merits of the plaintiffs' assertions concerning whether FEB shares could be attributed to BLC during the period of BLP's existence and their assertion that the step transaction doctrine should not be applied to the transaction involving the dissolution of BLP and subsequent distribution of BLP-owned FEB stock and the transaction whereby 23,000 shares of FEB were sold by BLC to WEBCO. Also immaterial here is the fact that the defendants do not dispute plaintiffs' allegation, Compl. ¶¶ 105–07, that the defendants' purpose in causing the sale of 23,000 shares of FEB shares owned by BLC to WEBCO was to avoid any potential Section 160(c) problems. The defendants' concern over the possibility of Section 160(c) sterilization in a factual scenario not previously addressed by the Court is not relevant to this decision.

fiduciary duty, as directors of the Best Companies, "to seek to obtain the greatest value reasonably attainable" in the Freeze–Out Mergers.[135] In this same vein, they allege that the Bests instructed Piper Jaffray "to refrain from seeking to ascertain the interests of third parties"[136] in the Best Companies. They further allege that the Bests prevented "the possibility of a public stockholders vote in favor of a third-party transaction and/or the tender of the publicly-held shares into a third-party tender offer."[137]

 Although Count III is labeled a *Revlon*[138] claim, it can more fairly and more reasonably be read, in my opinion, as asserting an entire fairness claim similar to that which appears in Counts I and II of the consolidated complaint. That claim is a straightforward challenge to the fairness of the Freeze–Out Mergers. It is alleged that the individual defendants, as the only directors and controlling stockholders of the Best Companies, structured the Freeze–Out Mergers in a manner that denied any input from the minority stockholders into the process of the mergers, lacked any board member whose interest was to protect the minority, and failed to engage a truly independent financial advisor to authenticate that the merger price was the best available in these circum-

stances. In this manner, Count III reiterates the gravamen of Counts I and II; that is, plaintiffs' challenge is to the self-dealing nature of the transactions and the unfair prices that resulted from the tainted processes. As this Court has noted before, this states a claim sufficient to survive a motion to dismiss and sufficient to put the defendants to proof that the transactions were entirely fair to the minority public shareholders.[139]

Accordingly, I grant defendants' motion to dismiss Count III to the extent, if at all, that it purports to state a *Revlon* claim, but otherwise the defendants' motion to dismiss Count III is denied insofar as Count III, as a substantive matter, reiterates an entire fairness claim similar to that which appears in Counts I and II of the consolidated complaint.

## VI. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

 The plaintiffs have asked the Court to certify, as one class, all shareholders of the former Best Companies other than Russell and Mariea Best or an entity under their control. They have submitted a proposed Order to this Court that would certify each of the seven named plaintiffs as class representatives. Four of

135. Compl. ¶ 171.

136. *Id.* ¶ 170.

137. *Id.*

138. *Revlon v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1985).

139. *Wood v. Frank E. Best, Inc.*, Del.Ch., C.A. No. 16281, slip op. at 13, Chandler, C., 1999 WL 504779 (July 9, 1999). To the extent Count III purports to state a *Revlon* claim, it obviously fails to do so, as a matter of law. Put simply, directors have no duty to engage in a *Revlon*-style auction when a majority stockholder can block the proposed transaction. *See, e.g., Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 845 (1987).

The allegation that the directors of the Best Companies had a duty to "obtain the greatest value reasonably attainable" for the public shareholders means, in my judgment, the greatest value reasonably attainable from the controlling shareholder, in accordance with the entire fairness standard. *See Mendel v. Carroll*, Del.Ch., 651 A.2d 297, 306 (1994) ("To acknowledge that the Carroll Family has no obligation to support a transaction in which they would in effect sell their stock is not, of course, to suggest that they can use their control over the corporation to effectuate a self-interested merger at an unfair price."). This is the claim, as I understand it, that survives in Counts I and II.

the seven named plaintiffs (Cardinal Capital Management, James Mitchell, Mitchell Partners L.P., and Daniel Raider) owned stock in all three Best Companies. Plaintiff Castillian Ventures, Inc. owned stock in BLC and FEB. The remaining named plaintiffs owned stock in just one of the Best Companies; plaintiff Dennis Wood owned stock only in FEB and plaintiff Edward McLaughlin owned stock only in BUL.

The defendants oppose plaintiffs' motion on four grounds. First, the defendants argue that the claims of the representative parties are not typical of the claims of the class. Second, they contend that the former shareholder class members who are still employees of Best Lock Corporation (as it exists today) have materially different interests than the proposed plaintiff class representatives. Third, they argue that the representative parties cannot adequately represent the class because of potential conflicts of interest that may emerge. Fourth and finally, defendants insist that class certification is premature. I will deal with each of these arguments in turn.

### A. Standard of Review

Chancery Court Rule 23(a) requires a plaintiff to establish four elements before the Court will certify a plaintiff class:

(1) that the class is so numerous that joinder of all members is impracticable;

(2) that there are questions of law or fact common to the class;

(3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) that the representative parties will fairly and adequately protect the interests of the class.[140]

### 1. Numerosity and Commonality

The first two of these requirements, numerosity and commonality of questions of law or fact, are easily established in this action. Each of the Best Companies had hundreds of public shareholders, all of whom are affected in the same way by the acts of defendants. The issues raised in this case relate to the third and fourth requirements, typicality and adequacy of representation.

### 2. Typicality

Rule 23(a)(3) focuses on whether the claims or defenses of the class representatives fairly present the issues on behalf of the represented class. The Supreme Court of Delaware has stated that "[a] representative's claim or defense will suffice if it 'arises from the same event or course of conduct that gives rise to the claims [or defenses] of other class members and is based on the same legal theory.' "[141]

Plaintiffs contend that the legal issues that they raise are identical to the claims of all other members of the proposed class. Defendants argue that this is untrue because certain shareholders are subject to the acquiescence defense discussed previously in this opinion and because the viability of the claims of some of the would-be class members is tied to the alleged disclosure violations. Because I have determined that shareholders who tendered their shares cannot be held to have acquiesced and because I am dismissing the disclosure claims, defendants arguments are now moot. The plaintiffs' fiduciary

---

**140.** Ct. Ch. R. 23(a). If the plaintiff establishes the elements of Rule 23(a), this Court must then determine whether to maintain the class action under Rule 23(b).

**141.** *Leon N. Weiner & Assoc. v. Krapf*, Del. Supr., 584 A.2d 1220, 1226 (1991) (quoting *Zeffiro v. First Pa. Banking & Trust Co.*, 96 F.R.D. 567, 569 (E.D.Pa.1983)).

claims surviving this opinion are typical of the claims of the proposed class.

### 3. *Adequacy of Representation*

The requirement that the class representative adequately represent the interests of the class is similar to the typicality requirement, but it focuses more directly on whether the proposed class representative has any conflict of interest with the class.[142] This requirement presents a question of fact to be resolved on a case-by-case basis in the sound discretion of the Court.[143] Our cases indicate that this Court " 'can and should examine any intrinsic factors, that is, outside entanglements which make it likely that the interests of the other [class members] will be disregarded in the prosecution of the suit.' "[144] The United States Supreme Court has confirmed that an analysis of adequacy must "serve[ ] to uncover conflicts of interest between named parties and the class they seek to represent."[145] Defendants argue that the plaintiffs do not adequately represent the class for two reasons: shareholders who are currently employed by the still-existing Best Lock Corporation have materially different interests in the litigation from other class members, and shareholders of each of the different Best Companies have materially different interests from one another, particularly with respect to the allocation of a control premium.

The purported conflict of interest with the employee-shareholders is based on the interest of those employees in the continuing financial health of Best Lock Corporation, their employer. These shareholders, defendants contend, may not be seeking to obtain the highest possible value for their shares because a large damage award could bankrupt the company. Plaintiffs note, however, that these employees, who owned shares through BLC's Stock Bonus Plan before the Freeze–Out Mergers, comprise at most 9% of the class. This is because the Bonus Plan owned less than 9% of the shares of BLC held by all members of the putative class. Moreover, as plaintiffs point out, the class action would continue, albeit on a slightly smaller scale, if the current employees were carved out of the class. Excluding these employees from the class would not materially reduce the risk faced by Best Lock Corporation. Additionally, if a damage award was to result from continued class action litigation and this award was large enough to threaten the vitality of Best Lock Corporation, the exclusion of these employee-shareholders from the class would preclude them from sharing in such award. Moreover, adjudication of the issues in a class action setting excluding the employee-shareholders would eliminate the possibility of those employees from separately pursuing what might have been their legitimate claims.

For these reasons, I am not convinced that any conflict of interest which these employees may have with the proposed class representatives is outweighed by the harm the employee-shareholders might suffer were they excluded from the class. This is particularly true in light of the fact that their exclusion would not likely bene-

---

142. The requirement of adequate representation also includes an element of adequate counsel for the plaintiffs. This element is not at issue in this case because the plaintiffs have hired competent counsel who will fairly and adequately represent the class.

143. *Price v. Wilmington Trust Co.*, Del.Ch., 730 A.2d 1236, 1238 (1997).

144. *Van de Walle v. Unimation, Inc.*, Del.Ch., C.A. No. 7046, slip op. at 9, Hartnett, V.C., 1983 WL 8949 (Dec. 6, 1983) (quoting *Youngman v. Tahmoush*, Del.Ch., 457 A.2d 376, 379 (1983)).

145. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

fit the defendants by greatly reducing their possible liability to the remainder of the class.

■ The alleged conflict of interest among shareholders of the different Best Companies stems from the assertion that differing recoveries could result for shareholders of each of these companies in two ways. The first is that one set of shareholders may demand a control premium for their shares. The second is that inconsistent recoveries might flow from the various theories of recovery put forth by the plaintiffs. Defendants contend, for example, that former shareholders of BUL would want to obtain a control premium for BUL's shares of BLC, thereby disadvantaging former shareholders of BLC. Moreover, defendants argue that plaintiffs' various theories of recovery would lead to inconsistent recoveries among shareholders of the different Best Companies. I am not convinced, however, that either of these challenges to certification of a single class amounts to a fatal conflict. With respect to the possibility of different recoveries resulting from different theories of recovery put forth by the plaintiffs, my ruling that Counts II and III merely reiterate an entire fairness claim similar to that which appears in Count I means that there will be only one theory of recovery applicable to all plaintiff shareholders.[146]

With respect to the payment of a control premium, it is not apparent that recovery by one group of shareholders would necessarily come at the expense of another group. If an additional premium of, for the sake of argument, 20%[147] is paid for BUL's shares of BLC, then BUL will be 20% more valuable. This is because the shares of BLC are the only material asset of BUL. BUL's shareholders, including FEB, will be paid 20% more for their shares. FEB, in turn, would also be 20% more valuable, because its only material asset is its shares of BUL. If, to the contrary, the premium is paid at the level of BLC, then all shareholders of BLC, including BUL, would receive 20% more for their shares of BLC. BUL, then, would once again be 20% more valuable, and the shareholders of BUL and FEB would be no better or worse off than if the premium were paid at a higher level of the corporate chain. Because the premium is a percentage rather than a fixed dollar amount, gains by one group of shareholders do not necessarily come at the expense of other groups of shareholders.[148]

146. In regards to the allocation of value in general, any value added as a result of this action would likely be allocated to the value of BLC, which was the only operating asset of the Best Companies. That value would then be allocated according to ownership percentages, which would thereby redound to the benefit of those shareholders who had an equity interest in one of the holding companies.

147. Nothing in this opinion should be read to suggest or require that such a premium would be appropriate in this case. The number used here is for demonstrative purposes only.

148. This conclusion becomes clearer when actual numbers are considered. If BLC were worth $100, then BUL would be worth roughly $80 (0.8 × $100) as a result of its owner-ship of approximately 80% of BLC. FEB, in turn, would be worth roughly $64 (0.8 × 0.8 × $100) as a result of its ownership of approximately 80% of BUL. Applying a 20% control premium to the shares of BUL owned by FEB would increase the value of FEB to $76.80 (1.2 × $64), while the values of BUL and BLC would remain unchanged. Applying a 20% premium to the shares of BLC owned by BUL would increase the value of BUL to $96 (1.2 × $80). This, in turn, would again increase the value of FEB to $76.80 (0.8 × $96), while BLC's value would remain unchanged. Shareholders of FEB would be in exactly the same position that they would have been in had the control premium been added at the level of FEB rather than the level of BUL. This is not a coincidence; in fact, it is nothing more than a recognition of the algebraic truth that $(a \times b) \times c = a \times (b \times c)$, or

### 4. *Rule 23(b)*

 Because the elements of Rule 23(a) appear to be satisfied, I turn briefly to Rule 23(b). Plaintiffs seek class certification under Rule 23(b)(1), which permits class certification when the prosecution of separate actions by individual members of the class would risk inconsistent adjudications or adjudications with respect to individual members of the class that would be dispositive of the interests of other class members not parties to those adjudications or would substantially impair the ability of nonparties to protect their interests. Defendants make no objection to this claim. Class certification under Rule 23(b)(1) is proper in this case because the multiple lawsuits that would follow were this motion denied would be both prejudicial to nonparties and inefficient.[149]

For these reasons, I am prepared to certify the class provisionally, subject to re-evaluation should an unforeseen conflict between the different groups of shareholders arise.[150] The provisional nature of this certification also addresses the defendants' concern that class certification would be premature, because this does not constitute a final ruling on the issue.

### VII. CONCLUSION

For the reasons stated above defendants' motion to dismiss the fiduciary duty claims stated in Count I in connection with the Freeze–Out Mergers and the Challenged Sale is denied. The motion to dismiss all of the disclosure claims of Count I is granted. Defendants' motion to dismiss the claims of plaintiffs who have tendered their shares on the grounds of acquiescence is denied. As to Count II, defendants' motion to dismiss with regard to the Challenged Sale is granted to the extent Count II alleged a transfer of control to and from the public shareholders by the action of Section 160(c), but the motion is denied to the extent that Count II reiterates the same entire fairness claim that appears in Count I. As to Count III, defendants' motion to dismiss is granted to the extent that Count III purports to assert a *Revlon* claim, but, as with Count II, the motion is denied to the extent that Count III reiterates an entire fairness claim similar to that which survived in Counts I and II. Finally, this Court will provisionally certify the class under Rule 23(b)(1).

Counsel for the plaintiffs shall submit a form of Order, on notice to defendants, that implements the conclusions reached in this decision.

in this case, $(0.8 \times \$80) \times 1.2 = 0.8 \times (\$80 \times 1.2)$. Best Company shareholders receive *exactly the same amount* regardless of whether a control premium is applied directly to the company in which they own stock or to a subsidiary of that company.

If the premium is applied at the level of BLC, as plaintiffs advocate, recovery is maximized for all public shareholders: BLC's value increases to $120, which in turn increases the value of BUL to $96 and the value of FEB, once again, to $76.80. Applying a control premium at the level of BLC does not come at the expense of the shareholders of either BUL or FEB. All it does, in fact, is increase the amount the defendants would be forced to

pay, which presumably is at least one of the reasons they challenge that result. In any case, there is no conflict among shareholders of the different Best Companies regarding the allocation of a control premium.

**149.** *See, e.g., Wacht v. Continental Hosts, Ltd.,* Del.Ch., C.A. No. 7954, slip op. at 22, Chandler, V.C., 1994 WL 728836 (Sept. 16, 1994, *modified,* Dec. 23, 1994).

**150.** If class counsel has already negotiated, or will in the future negotiate, a "fee agreement" with the class representatives, the agreement and the circumstances surrounding its negotiation should be brought to the Court's attention as promptly as possible.