# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE STATE OF DELAWARE, | ) | |
| | ) | |
| Petitioner, | ) | C.A. No.:  5009-VCG |
| | ) | |
| v. | ) | |
| | ) | |
| SWEETWATER POINT, LLC, and | ) | |
| LEHMAN BROTHERS HOLDINGS, INC., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Date Submitted:  March 28, 2022
Date Decided:  June 30, 2022

Gerald I.H. Street and John I. Ellis, of STREET & ELLIS, P.A., Dover, Delaware; Bradley S. Eaby, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *Attorneys for Petitioner the State of Delaware.*

Richard P. Beck, of RICHARD BECK LLC, Centreville, Delaware; John H. Newcomer, Jr., of MORRIS JAMES LLP, Wilmington, Delaware, *Attorneys for Respondents Sweetwater Point, LLC and Lehman Brothers Holdings, Inc.*

**GLASSCOCK, Vice Chancellor**

Again, I address in this Memorandum Opinion title issues regarding that tract of land in Sussex County once known as "Dry Boots."

The original action, filed in 2009, involved a petition by the State of Delaware (the "State") to quiet title to a parcel of real estate at the head of Millsboro Mill Pond, patented as Dry Boots but referred to here as "Parcel 46."[1]  I will not restate the extensive factual record addressed in my Memorandum Opinion of 2017; sufficient here is that the State and the Respondents—Sweetwater Point, LLC ("Sweetwater") together with its creditor and mortgagee, Lehman Brothers Holdings, Inc. ("Lehman")—each claimed record title through two separate chains of title, and that resolution of the issue of superior title involved tracing the ownership of the parcel back to colonial times.[2]  Through the near-heroic efforts of the litigants, I was able to establish that the title held by the State was superior to that of Sweetwater, which wished to place a residential development on Parcel 46.[3]  The decision was difficult, because both chains of title ran through sheriff's deeds and other conveyances unenhanced by metes-and-bounds descriptions.[4]  In other words, the ownership of Parcel 46 was not clear from an examination of either title, unsupplemented by other evidence.  The tract of land, meanwhile, lies in a remote area of Sussex County, is

---

[1] *State v. Sweetwater Point, LLC*, 2017 WL 2257377, at \*2, \*5 n.28, \*7 (Del. Ch. May 23, 2017) [hereinafter "*Sweetwater I*"].
[2] *See generally id.*
[3] *Id.* at \*5–6, \*25.
[4] *See id.* at \*3.

1

landlocked, and was used only as a woodlot for decades.[5] What would likely have been a matter of adverse possession in favor of Sweetwater was removed from that beneficial doctrine because the State is not so subject.[6]

After buying Parcel 46 and an adjacent parcel for highway access in order to develop the property as residential real estate, Sweetwater expended rather extensive efforts to gain the required permits for development,[7] and in light of the State's laggardly assertion of title, sought (in the alternative to its own quiet title) damages via counterclaim, later amended (the "Amended Counterclaim").[8] I bifurcated the matter and tried the title, and the parties have been preparing the damages phase since I found the State's title superior in 2017.[9]

Via their Amended Counterclaim,[10] the Respondents seek damages from the State based on a remarkable variety of theories. These include gross negligence,[11] fraudulent concealment as to the State's title,[12] quasi-contract involving a boundary-line agreement with Sweetwater's predecessors in title,[13] bad faith (relating to the

---

[5] *See id.* at *2, *5.
[6] *Id.* at *1.
[7] *Id.* at *5–7.
[8] *See* Resp't's Answer to Am. Pet. for Declaratory J. and Quiet Title, Dkt. No. 12. The Respondent at that time, Sweetwater only, also sought a declaration that it held "legal and equitable title" "free and clear of all claims by the State" to Parcel 46. *See generally id.*
[9] *Sweetwater I*, 2017 WL 2257377, at *7, *23.
[10] Resp'ts' Answer to Am. Pet. for Declaratory J. and Quiet Title and Am. Countercl., Dkt. No. 273 [hereinafter "Countercl."].
[11] *Id.* ¶¶ 68–86.
[12] *Id.* ¶¶ 87–94.
[13] *Id.* ¶¶ 101–10.

2

State's intention to build a highway over the property; the Respondents' theory is that the State delayed approval of development of the parcel so that it would not have to pay improved value in a condemnation action);[14] and imposition of an equitable mortgage lien in favor of Lehman.[15] Accordingly, the Respondents seek damages, on theories of measurement as wide-ranging as their grounds for relief, from the straightforward (taxes and fees paid to the State) to the ambitious (lost opportunity costs from the development that never occurred).[16] At issue here is yet another theory of damages, in inverse condemnation, together with Sweetwater's claim for "equitable title."[17] Both of these causes of action require a finding that the State is estopped from contesting title via application of the doctrine of acquiescence.[18]

Lehman brought the instant motion for partial summary judgment (the "Motion"),[19] later joined by Sweetwater;[20] the State briefed the matter as though it had brought a cross-motion, but in fact none has been docketed,[21] and I address the

---

[14] *Id.* ¶¶ 95–100; *see also id.* ¶¶ 111–19.

[15] *Id.* ¶¶ 126–38. The Amended Counterclaim at Count VI also seeks "Delay Damage," a cause of action I admit to not understanding. *See id.* ¶¶ 120–25.

[16] *Id.* at 57–60.

[17] *Id.* ¶¶ 139–41.

[18] *Id.*; *see also id.* ¶¶ 111–19.

[19] Resp't Lehman Brothers Holdings, Inc.'s Mot. for Partial Summ. J., Dkt. No. 328.

[20] Resp't Sweetwater Point, LLC's Joinder in Lehman Brothers Holdings, Inc.'s Mot. for Partial Summ. J., Dkt. No. 434.

[21] *See* Pet'r the State of Delaware's Answering Br. to Resp't Lehman Brothers Holdings, Inc.'s Opening Br. in Supp. Their Mot. for Partial Summ. J., Dkt. No. 336.

Respondents' Motion only here. The unusual nature of these proceedings is illustrated by the Respondents' Motion, by which the parties have advanced, with my acquiescence, a discrete issue which may in some sense approach the advisory, but which the parties contend will be efficient in determining the future course of this litigation.

The issue before me arises thus: the Respondents allege that inverse condemnation may form the appropriate measure of their damages.[22] In other words, the measure of damages for the State standing by silently while the Respondents' predecessors acted based on their mistaken understanding that they had valid title to Parcel 46 is *the entire market value of Parcel 46*,[23] as enhanced by the Respondents' frustrated development plans. As I understand it, the Respondents reach this remarkable result via the following syllogism: the State did not assert its superior title in the years preceding Sweetwater's purchase of apparent ownership rights in the property; Sweetwater's predecessors relied on that silence as an acquiescence to the superiority of their title on the part of the State; under the doctrine of acquiescence, the State should be estopped from raising its superior title as a defense to the inverse condemnation counterclaim; and the only remaining entity with

---

[22] *See* Countercl. ¶¶ 111–19.
[23] As of 2006. *See id.* at 60.

colorable title, in that case, is Sweetwater.[24] Therefore, the State, which now occupies Parcel 46, should be deemed in equity to have "taken" the property from Sweetwater, and the value of the realty so seized is the damages.[25] The Respondents also seek to demonstrate that they hold "equitable title" to Parcel 46, again, based on the State's acquiescence.[26] Effectively, I note, both theories—equitable title and inverse condemnation—rely on the same assertion; that the State is estopped from asserting its title, due to acquiescence in the Respondents' (and their predecessors') actions.

The State has record title to Parcel 46.[27] Predicate to the theory set out above, therefore, is that the doctrine of acquiescence applies to the actions of the State and the Respondents' predecessors, barring the State from asserting that title. That is the linchpin of the inverse condemnation/equitable title claims. This is the theory which the parties have put before me, via the Respondents' Motion (and the State's phantom cross-motion). If the Motion were granted, obviously, other legal issues necessary to the inverse condemnation and equitable title claims would remain. Nonetheless, the litigation posture of the action—which has developed at the pace

---

[24] *See* Resp't Lehman Brothers Holdings, Inc.'s Opening Br. Supp. Its Mot. for Partial Summ. J. 59–60, Dkt. No. 328.

[25] *See* Countercl. ¶¶ 117–19.

[26] *See id.* ¶¶ 139–41. Because this Memorandum Opinion resolves the predicate acquiescence question against the Respondents, I need not address whether the Respondents' equitable title claim comes too late, given the outcome of the title phase of this matter decided in *Sweetwater I*.

[27] *See, e.g.*, *Sweetwater I*, 2017 WL 2257377, at *25.

at which an oak tree grows—would be advanced, based upon resolution of the pivotal application of acquiescence doctrine. Accordingly, I resolve that issue to the extent consistent with the current record, below.

The burden is on the Respondents to demonstrate that no issue of material fact exists, and that based on the undisputed facts of record I may find that acquiescence applies to the State here, estopping it from asserting its superior title in the damages phase of this litigation. This, I find, I cannot do. My reasoning follows.

## I. FACTUAL BACKGROUND

The Respondents put forward the theory that the State acquiesced in the Respondents' chain of title, which I will refer to as the "Houston-White Chain," in the following ways and based on the following facts. The State obtained title to Parcel 46 beginning in 1931 via the "1931 Deed."[28] Around 1974, Sussex County engaged in a reassessment program, which led to the creation of tax parcel maps.[29] These maps indicated that Parcel 46 was taxed to a peach basket manufacturer, Houston-White Company ("Houston-White"), which both paid taxes on Parcel 46 and timbered Parcel 46 in support of its operations.[30] The State did not assert any right to Parcel 46 in the 1970s.[31]

---

[28] *Id.* at *9.
[29] *Id.* at *4.
[30] *Id.*
[31] *See id.*

Fifteen years later, in 1989, the State designed a nature preserve (the "Nature Preserve") on lands adjacent to Parcel 46.[32]  The State sent Houston-White a letter regarding the Nature Preserve, but Houston-White did not respond.[33]  Although the State evidently did not expressly assert its rights to Parcel 46 to Houston-White at this time, the Articles of Dedication in support of the Nature Preserve include a surveyor's drawing that shows part of Parcel 46 as within the Nature Preserve—i.e., showing Parcel 46 as, at least in part, State land.[34]  The drawing was recorded in 1991.[35]

In 1997, Houston-White executed a deed to convey Parcel 46 to certain individuals, who passed away relatively quickly.[36]  Ultimately, Winnie White Kee became the co-executrix for the estate.[37]  Kee and an attorney contacted the State to discuss either donating or selling Parcel 46.[38]  Kee met with a State employee, Charles Ronald Vickers, Manager of the Land Preservation Office for the Delaware Department of Natural Resources and Environmental Control ("DNREC").[39]  That

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

meeting was physically located on Parcel 46, and the parties evidently walked throughout the property during the meeting.[40]

Vickers "expressed interest" in Parcel 46 on behalf of the State at that meeting, and "discussed the need for an appraisal."[41] I may infer, based upon this record, that the "interest" expressed was the State's interest in acquiring the property. Kee testified that Vickers did not mention either the Nature Preserve—which, per recorded surveyor's drawing as of 1991, included part of Parcel 46—or the idea that the State already owned any or all of Parcel 46 at the meeting.[42] For his part, Vickers testified that he knew of the 1931 Deed the State later relied on in this case to prove its superior chain of title, but that he "relied on" the Nature Preserve drawing to understand the applicable boundary lines.[43] Vickers also testified that he was unaware that the Nature Preserve drawing conflicted with Kee's understanding of the property lines.[44]

The State did not take immediate action following this meeting, and Kee sought her own improvements to Parcel 46. Namely, Kee purchased Parcel 44, an adjoining parcel, to provide access to Parcel 46, which was otherwise landlocked.[45] During this time, Kee also cut a lane on Parcel 46, felled trees, posted multiple signs

---

[40] *Id.* at *4–5.
[41] *Id.* at *4.
[42] *Id.* at *5.
[43] *Id.*
[44] *Id.*
[45] *Id.*

prohibiting trespassing, and installed a gate on Parcel 44.[46] The State did not object to any of these actions.[47]

Subsequently, in April 2005, the two parcels were acquired by Sweetwater's immediate predecessor, Oriskany, Inc. ("Oriskany"),[48] which proceeded to attempt to develop Parcel 46. Oriskany devoted effort and expense to its development effort, which included applying for and receiving various State-issued permits.[49]

On August 1, 2005, the State made its first claim as to Parcel 46, by way of letter from Robert Line, a DNREC Office of Nature Preserves employee.[50] The letter (the "Line Letter"), which was directed to an environmental engineering firm working for Sweetwater's land planner, stated that the "exact boundary" between the Nature Preserve and Sweetwater-the-development "has been in dispute (Ron Vickers, per. comm.)," and that the dispute had to be resolved before the development process could continue.[51]

## II. ANALYSIS

Can an individual be divested of title to real property in equity via the doctrine of acquiescence? I can find no Delaware authority by which an entire parcel of realty has been divested by dint of the express theory of acquiescence, as the Respondents

---

[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.* at *6.
[51] *Id.*

seek to do here.[52] Nonetheless, theoretically, the doctrine can operate to divest real property. A small number of Delaware cases have applied acquiescence to disputes over property boundaries, where actions inimical to later assertions of boundary lines, sufficient to invoke acquiescence, would have resulted in at least minor divestiture of real property.[53] Such a result is an equitable analog to adverse possession or prescriptive easement, doctrines that require twenty years of failure to assert title for prescriptive rights to ripen.[54] This reflects the dignity of record title

---

[52] The Respondents cite *Timmons v. Campbell*, 111 A.2d 220 (Del. Ch. Jan. 24, 1955), as the primary case supporting their entitlement to a finding of divestiture of equitable title via acquiescence, but *Timmons* invokes a separate doctrine, equitable estoppel. The case is discussed at length, *infra*; I find it unhelpful to the Respondents. Nonetheless, *Timmons* is instructive to the extent that it emphasizes the limited circumstances in which equitable estoppel—and presumably acquiescence—should be employed to divest one of title to real property: "[I]t must be observed that equity applies this principle of estoppel cautiously and only in a case clear upon the circumstances, because in doing so it interferes with what otherwise is to the party an admitted legal remedy. Hence it is required that the matter of estoppel, i.e., the facts out of which it arises, be clearly established in evidence[.]" *See id.* at 225.

[53] *See, e.g.*, *In re Lot No. 36*, 2004 WL 3068348 (Del. Ch. Dec. 29, 2004) (citation omitted) ("For example, it is well-settled that disputed boundary lines, when resolved through application of practical location and acquiescence, run with the land. These doctrines are based on 'the sound public policy to avoid litigation over boundary lines.'"); *Street v. McIlvaine*, 1995 WL 214350, at *5 (Del. Ch. Mar. 23, 1995) ("A third exception to the statute of frauds is the doctrine of acquiescence, which allows adjoining landowners to establish a boundary line not complying with the original true line by one party laying out the boundary and the other person not disputing it."); *Lindsay v. Springer*, 4 Harr. 547 (Del. Super. Oct. 1, 1847) ("The lapse of twenty years is merely matter of evidence to establish a particular fact. . . . [T]he acquiescence in a boundary line for the same length of time, by the parties interested, is conclusive evidence of an express agreement to establish such line and to adhere to it[.]").

[54] It is worth noting the differences between divestiture of record title by adverse possession and divestiture of equitable title by acquiescence. The former focuses, in the first instance, on the claimant, and her assertion of a claim of right in the property in a way that is open, notorious, and hostile to the interest of the record title holder, for a period of twenty years. If the record holder fails to assert his rights during the prescriptive period, title may be settled in the claimant. By contrast, with acquiescence, it is the record-holder's actions or inactions in response to another's assertion of rights that are the initial focus. If the record-holder behaves in a way that indicates that he is acquiescing in another's possessory actions, he may be estopped from asserting his rights,

10

and the fact that divestiture by failing to assert title must be prolonged and obvious to have legal significance. Our case law has applied the twenty-year standard to this equitable analog action of divestiture by acquiescence; the behavior representing acquiescence must take place over a period of twenty years before equitable title is lost.[55]

Did the State acquiesce to actions of Sweetwater's predecessors in the assertion of the Houston-White Chain? The cases *Klaassen v. Allegro Development Corp.*[56] and *Street v. McIlvaine*[57] are instructive to the analysis.

*Klaassen* is a recent case from our Supreme Court applying the acquiescence doctrine in the context of a chief executive officer's termination. There the Court held that a claimant has acquiesced in a complained-of act where the claimant has "full knowledge of his rights and the material facts"[58] and two other elements are satisfied. The claimant must either (1) remain inactive for a considerable time, (2) freely engage in acts amounting to recognition of the complained-of act, or (3) act in a manner inconsistent with a subsequent repudiation of the complained-of

---

where the other is led to believe his possessory actions are approved. *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035 (Del. 2014). If the acquiescence is to be sufficient to divest title, the behavior must persist over a period of twenty years. *Compare, e.g.*, *Tumulty v. Schreppler*, 132 A.3d 4, at 23–24 (Del. Ch. 2015) (dealing with adverse possession), *with Klaassen*, 106 A.3d at 1047 (dealing with acquiescence); *see also Street*, 1995 WL 214350.

[55] *Street*, 1995 WL 214350, at *5. Again, the State is not subject to adverse possession.
[56] 106 A.3d at 1047.
[57] *Street*, 1995 WL 214350, at *5.
[58] *Klaassen*, 106 A.3d at 1047.

act. In addition, the claimant's acts satisfying (1), (2), or (3) must "lead[] the other party to believe the act has been approved."[59]

*Street* applied the prescriptive period to a divestiture of title via acquiescence. The *Street* Court noted that a disputed title could be divested, at least in the context of a boundary line agreement, by acquiescence, but only if the acquiescence continues over a twenty-year period.[60] "[A] party must prove acquiescence for a twenty-year period, the same length of time as required for the doctrine of adverse possession."[61]

Application of the acquiescence doctrine in this context, I note, works an equitable forfeiture of record title.[62] Forfeitures are disfavored in equity, and must be supported by clear and convincing evidence.[63]

---

[59] *Id. Klaassen* outlines a test for acquiescence that bears some similarity to the doctrine of laches. As I have noted previously, acquiescence cases in Delaware appear to fall into three generalized categories: laches-like acquiescence, estoppel-by-silence type acquiescence, and acquiescence as applied in the corporate benefit context. Assuming that *Klaassen* applies universally, prior caselaw imposing differing standards or elements for different types of acquiescence is no longer current. *See, e.g.*, *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014). In any event, I follow *Klaassen* here.

[60] *Street*, 1995 WL 214350, at *5.

[61] *Id.*

[62] I assume without deciding that the doctrine of acquiescence may operate against the sovereign even where adverse possession may not.

[63] *See Clements v. Castle Mortg. Serv. Co.*, 382 A.2d 1367, 1370 (Del. Ch. 1977) (citations omitted); *id.* (citing *Johnson v. Feskens*, 31 P.2d 667 (Or. 1934)); *cf., e.g.*, *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1080 (Del. Ch. 2001) (considering acquiescence in the context of a corporate transaction and describing the need to show "unequivocal approval" of the transaction); *Falcon Steel Co. v. HCB Contractors, Inc.*, 1991 WL 50139, at *4 (Del. Ch. Apr. 4, 1991) (finding that in the context of acquiescence due to acceptance of a benefit, it must be shown upon "clear and decisive" grounds that the acceptance was meant as an acquiescence); *Timmons*, 111 A.2d at 225 ("Hence it is required that the matter of estoppel, i.e., the facts out of which it arises, be clearly established in evidence[.]").

12

Here, the State alerted the Respondents to its title claim—and ended any potential period of acquiescence—in August 2005.[64] To the extent that the Respondents seek to use acquiescence by silence to estop the State from raising its title as a bar to inverse condemnation or to divest the State's title, per *Street*, that acquiescence following a possessory act by the Respondents' predecessors must have continued over a twenty-year period before 2005, that is, commencing no later than 1985.

The universe of possible acquiesced-to acts undertaken by the Respondents' predecessors is small. First, Sussex County created a tax map in the 1970s showing that Sweetwater's predecessor, Houston-White, paid taxes as the owner of Parcel 46.[65] I see no reason to impute knowledge of Houston-White's payment to the State, given that the tax map and attendant review was undertaken by the county rather than the State. The only other complained-of act that might give rise to acquiescence, pre-1985, is that Houston-White, apparently under its claim as a predecessor of Sweetwater in the Houston-White Chain, timbered Parcel 46 in the 1970s.[66] This timbering fails to demonstrate acquiescence on the part of the State and in favor of the Respondents, on two grounds.

---

[64] Via the Line Letter. *See supra* note 50 and accompanying text.

[65] *Sweetwater I*, 2017 WL 2257377, at *4.

[66] *See supra* note 30 and accompanying text. The Respondents would have my analysis of acquiescence begin sooner, "from the State's recordation of the 1931 Matthews Deed." *See* Resp'ts' Suppl. Reply Br. Supp. the Joinder of Sweetwater Point, LLC in Lehman Brothers

First, application of acquiescence following *Klaassen* requires proof that the party estopped had full knowledge of its own rights and "the material facts."[67]  Here, the record does not establish that the State was aware of all material facts—particularly, the record does not demonstrate as a matter of law that the State knew of the timbering of this remote parcel.  As a matter of equity, the absence of *knowing* failure to act is a bar to acquiescence.[68]

Second, there is no evidence from which I may infer reliance on the State's silence—that "the other party" was led "to believe the act ha[d] been approved"—by Houston-White.[69]  Both the State and Houston-White are charged with knowledge of the record documents of title; both had the same knowledge, presumably, in 1985.  The 1931 Deed, being recorded,[70] was publicly available.  Thus, if the State should be held to have had full knowledge of its rights to Parcel 46—which the Respondents urge—Houston-White was therefore also on constructive notice of the 1931 Deed and the State's claim to Parcel 46.[71]  And

Holdings, Inc.'s Mot. for Partial Summ. J. 5, Dkt. No. 444.  But the State's act here is in no way *an acquiescence*, and is not inconsistent with its current claim of title.

[67] *See, e.g.*, *Klaassen*, 106 A.3d at 1047.

[68] *See, e.g.*, *id.*

[69] *See id.*

[70] *See* Parties Joint Pre-Trial Stipulation 6, Dkt. No. 136.

[71] *See Mendenhall Vill. Single Homes Ass'n v. Harrington*, 1993 WL 257377, at *2–3 (Del. Ch. June 16, 1993).  Arguably, the 1931 Deed was insufficiently clear to provide constructive notice.  This interpretation is supported by the painstaking effort required of this Court to determine who held superior title to Parcel 46 in this case, and by the Respondents' stout defense in this action of their own title claim.  But to prevail on their motion, the Respondents must also argue that the 1931 Deed was sufficiently clear such that the State had "full knowledge" of its own rights.  *See* Resp't Lehman Brothers Holdings, Inc.'s Opening Br. Supp. Its Mot. for Partial Summ. J. 41–42,

pertinently, Houston-White, per the record, did nothing affirmative to indicate reliance on the State's silence in the decades following the 1970s timbering of Parcel 46, up through the time it sold the property in 1997.[72] There is no evidence that its successors affirmatively relied on the timbering incident as against the State's claim, either. The record cannot support a finding that the State acquiesced to Houston-White's claim of title, as of 1985 and for twenty years thereafter. This is fatal to the Respondents' Motion.

It is apparent that the State did act in ways that might invoke acquiescence[73] during and after the time that Kee offered to sell Parcel 46 to the State, but these acts occurred too late to have estopped the State from asserting its title in 2005 and thereafter, under the doctrine of acquiescence.

The Respondents—while arguing under acquiescence doctrine—cite *Timmons v. Campbell*[74] as the primary support for their argument, and indeed in that case the defendant was equitably estopped from asserting any right, title or interest in a subject real property against the plaintiffs.[75] *Timmons*, however, applied equitable estoppel as the theory under which the plaintiffs prevailed, rather than

---

Dkt. No. 328. *Pace* Professor Schrödinger, both cannot be the case. Absent proof of "full knowledge," the Respondents have effectively asserted only an (ineffective) adverse possession claim, not acquiescence.

[72] *See, e.g., Sweetwater I*, 2017 WL 2257377, at *4.

[73] I do not here opine on whether and which of the actions potentially attributable to the State may have been sufficient to support application of the acquiescence doctrine, post-1985.

[74] 111 A.2d 220 (Del. Ch. Jan. 24, 1955).

[75] *See generally id.*

acquiescence.[76]  The doctrine is similar, but not identical, to acquiescence.  This Court has recently stated the elements which a claimant must establish to state a claim for equitable estoppel:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.[77]

The facts of *Timmons*, which Chancellor Seitz understatedly termed "unusual," are instructive.[78]  That case did not involve record title—instead, it was a dispute concerning transfer of title under a will in an unprobated estate.[79]  There, a daughter, defendant Hauger, believed she stood to inherit a farm after the life estate of her father; defendant Campbell was named as remainderman should the father die without lawful issue.[80]  After the father died, Hauger remained in possession of the farm.[81]  Campbell made no objection thereto, despite the fact that he knew—and

---

[76] *See id.* at 224.

[77] *Hyetts Corner, LLC v. New Castle Cty.*, 2021 WL 4166703, at *10 (Del. Ch. Sept. 14, 2021) (citations omitted).

[78] *Timmons*, 111 A.2d at 225.

[79] *Id.* at 221.

[80] *Id.*

[81] *Id.*

16

Hauger did not—that she was born out of wedlock, and thus (under the then-law) was not "lawful issue" entitled to the farm;[82] instead, under the testamentary documents, ownership had passed to *Campbell* on the father's death.[83] Again, while Campbell knew this, Hauger was under the good faith but erroneous belief that her birth was legitimate.[84]

Some time later, believing she had title, Hauger offered the farm for sale.[85] This Campbell knew; again, he failed to object.[86] Hauger hired counsel, who saw that Campbell was named as a potential remainderman in the pertinent will.[87] He brought Campbell to his office and discussed the matter; again, remarkably, Campbell made no claim, and either affirmatively declared that he had no interest in the farm, or at least failed to disclose the salient fact that he knew, and that Hauger and her counsel did not: the fact of her illegitimate birth.[88] He remained silent while Hauger sold the property to a third party, the plaintiffs, Mr. and Mrs. Timmons.[89] The Timmons borrowed the purchase price from a bank, whose attorney also considered whether Hauger was the heir of the life tenant entitled to the farm; the

---

[82] *Id.* at 221–22.
[83] *Id.* at 221.
[84] The references to births as illegitimate or unlawful reflect the law in the mid-twentieth century. While these terms are indispensable in describing the holding in *Timmons*, they by no means reflect the understanding of this Court or the current law of Delaware.
[85] *Id.* at 222.
[86] *Id.* at 222–23.
[87] *Id.* at 222.
[88] *Id.* at 222–23.
[89] *Id.* at 223.

bank's attorney and the Timmons were misled by Campbell's acts and/or silence into thinking that Hauger was the legitimate heir and free to sell them the farm.[90]

Thereafter, once again, Campbell stood silent as the Timmons paid off the mortgage and made substantial improvements to the property.[91] Then, Campbell obtained a judgment of ejectment against the Timmons, based on Campbell's inheritance right and Hauger's illegitimate birth.[92] The Timmons sought to enjoin the ejectment, based on equitable estoppel.[93] Under these egregious facts, Campbell was estopped in equity from enforcing the judgment of ejectment.[94]

Here, the Respondents have not moved for summary judgment based on equitable estoppel, and the factors are not met on the record. The actions of the State, so far as the record reflects them, do not imply an intentional failure to assert title in the face of a transfer of real estate of which it was aware. Nothing in the record demonstrates that the State acted in bad faith, or remained silent in light of a known duty to act. The record reflects that the State was not diligent in protecting its property rights; again, that is indicative of an adverse possession claim, and not divestiture of equitable title under principals of equitable estoppel (or, as discussed earlier, acquiescence).

---

[90] *Id.*
[91] *Id.*
[92] *Id.* at 221.
[93] *Id.* at 220–21.
[94] *Id.* at 225.

18

The State stood by and failed to assert its rights in Parcel 46 while Sweetwater incurred expenses based on Sweetwater's understanding of title pursuant to the Houston-White Chain. The State may be liable under one or more of the various theories pled in the Amended Counterclaim. Its title may *not* be divested under acquiescence doctrine, under the facts of record as they exist, however; either via a claim of equitable title or to estop the State from opposing inverse condemnation.

Accordingly, the Respondents' Motion is DENIED. An Order is appended.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THE STATE OF DELAWARE, | ) | |
| | ) | |
| Petitioner, | ) | C.A. No.: 5009-VCG |
| | ) | |
| v. | ) | |
| | ) | |
| SWEETWATER POINT, LLC, and | ) | |
| LEHMAN BROTHERS HOLDINGS, INC., | ) | |
| | ) | |
| Respondents. | ) | |

## <u>ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

WHEREAS, Respondent Lehman Brothers Holdings, Inc. moved for partial summary judgment in the above-captioned action on September 30, 2021 (the "Motion");

WHEREAS, Respondent Sweetwater Point, LLC, joined the Motion on February 1, 2022;

IT IS HEREBY ORDERED, this 30th day of June, 2022, that the Respondents' Motion is DENIED.

/s/ Sam Glasscock III
Vice Chancellor Sam Glasscock III